**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOEL SABAN, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| vs. | ) | Case No. 2010 CV 2428 |
| | ) | |
| CAREMARK Rx, L.L.C., a Delaware Limited | ) | Judge Pallmeyer |
| Liability Company, CVS PHARMACY, INC., a | ) | |
| Rhode Island Corporation, and CAREMARK, | ) | Magistrate Judge Denlow |
| L.L.C., a California Limited Liability Company, | ) | |
| | ) | |
| Defendants/Counterclaim Plaintiffs. | ) | |

## ANSWER TO SECOND AMENDED COMPLAINT FOR DECLARATORY JUDGMENT, DEFENSES, AND VERIFIED COUNTERCLAIMS FOR INJUNCTIVE AND OTHER RELIEF

Defendants/Counterclaim Plaintiffs, Caremark Rx, L.L.C. ("Caremark Rx"), CVS Pharmacy, Inc. ("CVS"), and Caremark, L.L.C. (collectively, "Caremark" or the "Company") by their attorneys, hereby answer the Second Amended Complaint filed by Plaintiff/Counterclaim Defendant Joel Saban ("Saban") and submit verified counterclaims against Saban.

## INTRODUCTION

Through its counterclaims, Caremark seeks injunctive relief and damages against Saban, a highly compensated senior executive who misappropriated Caremark's confidential information and attempted to conceal his wrongdoing before he resigned and accepted a job as a senior executive with a direct competitor. Saban filed the Complaint in this case in an attempt to evade his 12-month non-competition agreement. Caremark's counterclaims seek enforcement of the agreement and other damages.

Saban worked as a senior executive for Caremark for over 10 years and had access to highly sensitive information about the company. He was responsible for Caremark's purchasing

of brand name pharmaceuticals and was directly involved in negotiations with clients regarding pharmacy benefit management ("PBM") contracts. Saban had access to the company's PBM budget and financial forecasts, and worked closely with the company's legal and compliance departments in monitoring Caremark's compliance with certain provisions of consent decrees between Caremark and the federal government.

In December 2009, Saban signed an Employment Agreement with a 12-month non-competition provision. The Employment Agreement superseded numerous prior non-compete agreements he had executed with Caremark. During the first four months of 2010 alone, Saban collected approximately $825,000 in salary, incentive compensation and CVS Caremark stock awards. Over the final three years of his employment, Saban repeatedly executed non-competition and non-disclosure agreements with Caremark, which paid him nearly $4 million in compensation through salary, bonus, stock options, and stock grants.

In early 2010, Saban sent highly confidential and competitively sensitive Company documents to his personal email address, including corporate strategies, the Company's forecasted financial performance, rebate analyses, and other documents. A few days before he resigned, Saban ran computer programs designed to delete information from his Caremark laptop computer in order to conceal his activities.

On April 19, 2010, Saban tendered his resignation. He then filed a Complaint with this Court seeking to evade the terms of his Employment Agreement, misleadingly alleging that his responsibilities at Caremark were very narrow and that his new position at Caremark's direct competitor would not be a threat. In fact, Saban will be the third-ranking executive at his new employer, and the Complaint omits any mention of the fact that he took with him Caremark's confidential information.

Saban's non-compete agreement should be enforced. He should be enjoined for 12 months from working for a competitor of Caremark. After receiving millions of dollars in compensation and blatantly misappropriating Caremark's confidential information, Saban should not be permitted to shirk his contractual duties. On the basis of the allegations in its Verified Counterclaims, Caremark is also entitled to relief under the Computer Fraud and Abuse Act and injunctive relief pursuant to Fed R. Civ. P. 65 to enforce limited restrictive covenants in the Employment Agreement, to enjoin Saban's violation of the Illinois Uniform Trade Secrets Act, and to remedy Saban's breaches of his fiduciary duty.

Caremark hereby answers Saban's Second Amended Complaint as follows:

## Paragraph 1

> By this action Mr. Saban, formerly an employee of the CVS Defendants, seeks a declaratory judgment setting aside, holding for naught and finding unenforceable certain unlawful and anti-competitive provisions of a 2010 Employment Agreement which he signed in December 2009 (the "2010 Employment Agreement"); finding that Mr. Saban is bound to no enforceable covenant(s) not to compete with the CVS Defendants or their affiliates and declaring that Mr. Saban is in no way contractually limited or inhibited in discharging employment duties to his non-party employer, SXC Health Solutions, Inc. ("SXC"). A true copy of the 2010 Employment Agreement is appended hereto and made a part hereof as Exhibit 1.

**ANSWER:**

Caremark admits only that Saban purports to bring this declaratory judgment action against it, but denies any and all allegations of wrongdoing and further denies that Saban is entitled to any relief whatsoever. Except as expressly admitted, Caremark denies the allegations in Paragraph 1.

## JURISDICTION AND VENUE

## Paragraph 3 [sic]

Mr. Saban is an individual citizen of the State of Illinois, residing in the Village of Buffalo Grove, Lake County, Illinois.

**ANSWER:**

Caremark admits the allegations in Paragraph 3.

### Paragraph 4

Caremark Rx is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in the State of Tennessee. Caremark Rx is a citizen of the states of Delaware and Tennessee. Caremark Rx's sole member is CVS Pharmacy.

**ANSWER:**

Caremark admits that Caremark Rx is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in the State of Tennessee. Caremark admits that Caremark Rx's sole member is CVS Pharmacy. Caremark denies that Caremark Rx is a citizen of the states of Delaware and Tennessee. Answering further, Caremark states that Caremark Rx is a citizen of Rhode Island because its sole member, CVS Pharmacy, is a citizen of Rhode Island.

### Paragraph 5

CVS Pharmacy is a corporation organized and existing under the laws of the State of Rhode Island, and which also has its principal place of business in the State of Rhode Island. CVS Pharmacy is a citizen of the State of Rhode Island.

**ANSWER:**

Caremark admits the allegations in Paragraph 5.

### Paragraph 6

Caremark, formerly known as Caremark Inc., is a limited liability company organized and existing under the laws of the State of

California with its principal place of business in the State of Tennessee. Caremark is a citizen of the states of California and Tennessee. Caremark's sole member is Caremark Rx.

**ANSWER:**

Caremark admits that Caremark, L.L.C., formerly known as Caremark Inc., is a limited liability company organized and existing under the laws of the State of California with its principal place of business in the State of Tennessee. Caremark admits that Caremark L.L.C.'s sole member is Caremark Rx. Caremark denies that Caremark, L.L.C. is a citizen of the states of California and Tennessee. Answering further, Caremark states that Caremark, L.L.C. is a citizen of Rhode Island because its sole member, Caremark Rx, is a citizen of Rhode Island.

### Paragraph 7

The CVS Defendants have transacted and continue to regularly transact and conduct business activities within the Northern District of Illinois from, among other places, offices and facilities located in Northbrook, Illinois.

**ANSWER:**

Caremark admits the allegations in Paragraph 7.

### Paragraph 8

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity in that Mr. Saban and the CVS Defendants (including the members of the two LLCs) are citizens of different states; no plaintiff herein is a citizen of the same state as any defendant herein, or any member of any defendant LLC; and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

**ANSWER:**

Caremark admits the allegations in Paragraph 8.

### Paragraph 9

Venue is proper in the United States District Court for the Northern District of Illinois, Eastern Division pursuant to 28 U.S.C. § 1391(b). Mr. Saban's employment relationship with the CVS Defendants was formed and Mr. Saban substantially discharged his employment duties to the CVS Defendants in the Northern District of Illinois. The 2010 Employment Agreement was likewise made, executed and substantially performed in the Northern District of Illinois. Mr. Saban was employed by the CVS Defendants in the State of Illinois at the time the CVS Defendants provided the 2010 Employment Agreement to him. Mr. Saban accepted employment with SXC in the Northern District of Illinois, where he likewise intends to substantially perform his employment duties to SXC.

**ANSWER:**

For purposes of this litigation only, Caremark waives any objection it might have to venue pursuant to Paragraph 7(i) of the 2010 Employment Agreement ("Agreement") and, therefore, admits that venue is proper in the United States District Court for the Northern District of Illinois, Eastern Division. Except as expressly admitted, Caremark denies the allegations in Paragraph 9.

### Paragraph 10

The Court has personal jurisdiction over the CVS Defendants because both generally, and with specific regard to Mr. Saban's employment with the CVS Defendants and to the 2010 Employment Agreement, the CVS Defendants have transacted and continue to regularly transact and conduct business activities within the Northern District of Illinois from, among other places, offices and facilities located in Northbrook, Illinois.

**ANSWER:**

Caremark admits the allegations in Paragraph 10.

### THE 2010 EMPLOYMENT AGREEMENT

### Paragraph 11

The 2010 Employment Agreement provides, among other things, that it was made "in consideration of the mutual covenants

contained" therein by and between Mr. Saban and "CVS Pharmacy, Inc." based on its desire to "continue [sic] to employ [Mr. Saban] at its subsidiary, Caremark Rx, LLC … or another of its operating subsidiaries…" (Ex. 1, p. 1).

**ANSWER:**

Caremark acknowledges that the document attached as Exhibit 1 is a true and correct copy of the Agreement, a document which speaks for itself.  To the extent any further answer is required, Caremark admits that Paragraph 11 accurately quotes a select portion of the Agreement.

## Paragraph 12

The 2010 Employment Agreement further provides, among other things, that for a Non-Competition Period of 12 months following the termination of his employment with the CVS Defendants for any reason, Mr. Saban:

"… will not, directly or indirectly, engage in Competition with the Company [defined as CVS Pharmacy, Inc.] …"

(Ex. 1, p. 4, §5, "Non-Competition").

**ANSWER:**

Caremark acknowledges that the document attached as Exhibit 1 is a true and correct copy of the Agreement, a document which speaks for itself.  To the extent any further answer is required, Caremark admits that Paragraph 12 accurately quotes a select portion of the Agreement.

## Paragraph 13

The Non-Competition provisions of the 2010 Employment Agreement define "Competition" as:

"… engaging in any activity for a Competitor of the Company, whether as a principal, agent, partner, officer, director, employee,

independent contractor, investor, consultant or stockholder (except as a less-than one percent shareholder of a publicly traded company) or otherwise."

(Ex. 1, p. 4, §5, "Non-Competition").

**ANSWER:**

Caremark acknowledges that the document attached as Exhibit 1 is a true and correct copy of the Agreement, a document which speaks for itself. To the extent any further answer is required, Caremark admits that Paragraph 13 accurately quotes a select portion of the Agreement.

### Paragraph 14

The Non-Competition provisions of the 2010 Employment Agreement define "Competitor" as:

"… any person, corporation or other entity (and its parents, subsidiaries, affiliates and assigns) doing business in any geographical area in which the Company or any of its subsidiaries or affiliates are doing or have imminent plans to do business, and which is engaged in the operation of: (a) a retail business which includes or has imminent plans to include a pharmacy (*i.e.*, the sale of prescription drugs) as an offering or component of its business, including but not limited to, chain drug store companies such as Walgreen Co. and Rite Aid Company, mass merchants such as Wal-Mart Stores, Inc. and Target Corp., and food/drug combinations such as The Kroger Co. and Supervalue Inc.; and/or (b) a business which includes or has imminent plans to include mail order prescription, specialty pharmacy and/or pharmacy benefits management or any other services offered by Caremark Rx, LLC as an offering or component of its business, such as Medco Health Solutions, Inc. or Express Scripts, Inc., and/or (c) a business which includes or has imminent plans to include offering, marketing or the sale of basic acute health care services at retail or other business locations, similar to the services provided by MinuteClinic, LLC (and excluding hospitals, private physicians' offices or other businesses dedicated to the direct provision of health care services)."

(Ex. 1, p. 4, §5, "Non-Competition").

**ANSWER:**

Caremark acknowledges that the document attached as Exhibit 1 is a true and correct copy of the Agreement, a document which speaks for itself. To the extent any further answer is required, Caremark admits that Paragraph 14 accurately quotes a select portion of the Agreement.

## MR. SABAN'S RESIGNATION FROM THE CVS DEFENDANTS

### Paragraph 15

Mr. Saban resigned his employment with the CVS Defendants on April 20, 2010. At the time of his resignation from the CVS Defendants' employment, Mr. Saban held the title of Senior Vice President, Industry Relations and Administration, and he was responsible for managing the contractual relationships with branded pharmaceutical manufacturers and managing the Maximum Allowable Cost ("MAC") aspect of the reimbursement to the retail network pharmacies.

**ANSWER:**

Caremark admits that Saban resigned his position as Senior Vice President, Industry Relations and Administration. Answering further, Caremark admits that, among many other responsibilities as set forth in Caremark's Verified Counterclaim and incorporated herein by reference, Saban was responsible for managing the contractual relationships with branded pharmaceutical manufacturers and managing the Maximum Allowable Cost ("MAC") pricing on behalf of the Defendants. Except as expressly admitted, Caremark denies the allegations in Paragraph 15.

## MR. SABAN'S SXC EMPLOYMENT

### Paragraph 16

After Mr. Saban's resignation from employment with the CVS Defendants, Mr. Saban accepted employment with SXC, as its Executive Vice President, Pharmacy Operations.

**ANSWER:**

Upon information and belief, Caremark admits that Saban has accepted employment with SXC. Caremark is without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations regarding Saban's job title and when he accepted employment with SXC and, therefore, denies same. Except as expressly admitted, Caremark denies the allegations in Paragraph 16.

**Paragraph 17**

SXC is a Texas corporation with its principal place of business in Lisle, DuPage County, Illinois. SXC's business includes, among other things: (1) developing and licensing pharmacy benefit claims processing software and hardware; and (2) providing pharmacy benefit management services to insurers, self-insured employers, union groups, governmental entities and other pharmacy benefit plan sponsors.

**ANSWER:**

Caremark admits that SXC is a Texas corporation with its principal place of business in Lisle, Dupage County, Illinois. On information and belief, Caremark further admits that SXC's business includes, among other things, the stated categories of business. Except as expressly admitted, Caremark denies the allegations in Paragraph 17.

**Paragraph 18**

Mr. Saban's employment duties with SXC do not include employment responsibilities identical or substantially similar to those which he performed for the CVS Defendants as a Senior Vice President, Industry Relations and Administration. Mr. Saban had no operational responsibilities respecting the CVS Defendants' mail-order or specialty pharmacy business when he left the CVS Defendants' employ and for a substantial period of time prior

thereto. By sharp contrast, at SXC, Mr. Saban has assumed the title of Executive Vice President of Operations for SXC, and in that capacity Mr. Saban's employment responsibilities are expected to include managing and overseeing the daily operations of SXC's mail-order and specialty pharmacy business segments for and on behalf of SXC, which business operations include providing pharmacy benefit management services to insurers, self-insured employers, union groups, governmental entities and other pharmacy benefit plan sponsors.

**ANSWER:**

Caremark is without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations regarding Saban's responsibilities and/or expected responsibilities at SXC and, therefore, denies same. Answering further, Caremark denies that Saban had no operational responsibilities for mail-order or specialty pharmacy business at Caremark. Except as expressly admitted, Caremark denies the allegations in Paragraph 18.

### Paragraph 19

As SXC's Executive Vice President of Operations, Mr. Saban will have no employment responsibilities relating to negotiating or contracting with branded pharmaceutical manufacturers on SXC's behalf, nor will he step into a working role for SXC that is the same as or similar to the working role he discharged for the CVS Defendants prior to his resignation from the CVS Defendants' employ.

**ANSWER:**

Caremark denies the allegations in Paragraph 19.

### Paragraph 20

While Mr. Saban's employment responsibilities to SXC do not overlap with his former employment responsibilities to the CVS Defendants, some aspects of SXC's business compete with some aspects of the CVS Defendants' business. Consequently, Mr. Saban anticipates that the CVS Defendants may or will maintain that Mr. Saban's employment with SXC violates the 2010

Employment Agreement, particularly the "Non-Competition" provisions thereof (Ex. 1, p. 4, § 5).

**ANSWER:**

Caremark admits that SXC's business directly competes with the Caremark's business. Answering further, Caremark denies that Saban's expected employment responsibilities to SXC do not overlap with his former employment responsibilities to Caremark. Answering further, Caremark admits that Saban's employment with SXC violates the 2010 Employment Agreement, including but not limited to the "Non-Competition" provisions thereof. Except as expressly admitted, Caremark denies the allegations in Paragraph 20.

## COUNT I

### (Claim for Declaratory Judgment)

### Paragraph 21

An actual controversy exists between Mr. Saban and the CVS Defendants under 28 U.S.C. § 2201. Mr. Saban and the CVS Defendants – parties having adverse legal interests – are engaged in a real and substantial controversy regarding the legality and enforceability of the 2010 Employment Agreement, most specifically the "Non-Competition" provision thereof, §5 (*Id.*). Given Mr. Saban's SXC employment, the nature of SXC's business, and the circumstances otherwise alleged herein, this dispute is of sufficient immediacy and reality to warrant issuance of a declaratory judgment in Mr. Saban's favor and against the CVS Defendants. The resolution of this dispute will aid in determining the controversy or some part of it.

**ANSWER:**

Caremark admits that an actual controversy exists between the parties as a direct result of Saban's violation of his 2010 Employment Agreement, including but not limited to the Non-Competition provisions thereof. Except as expressly admitted, Caremark denies the allegations in Paragraph 21.

### Paragraph 22

Mr. Saban seeks a declaratory judgment from this Court stating that the Non-Competition provisions of the 2010 Employment Agreement are invalid, illegal and unenforceable as applied to Mr. Saban's anticipated SXC employment in order that he may pursue his career with SXC and otherwise be and remain free from the unreasonable restraints of trade which the Non-Competition provisions of the 2010 Employment Agreement purport to impose upon him.

**ANSWER:**

Caremark admits only that Saban purports to bring this declaratory judgment action against it. Answering further, Caremark denies that the Non-Competition provisions Plaintiff purportedly seeks to invalidate are unreasonable and further deny that Saban is entitled to any relief whatsoever. Except as expressly admitted, Caremark denies the allegations in Paragraph 22.

**Paragraph 23**

The Non-Competition provisions of the 2010 Employment Agreement are vague, overly broad and violate public policy. Specifically, those Non-Competition provisions of the 2010 Employment Agreement should be declared void and unenforceable for the following reasons:

(a)     The geographic limitations set forth in the Non-Competition provisions of the 2010 Employment Agreement are vague, overly-broad and constitute illegal, and unreasonable restrains of trade and employment;

(b)     The scope of the business and employment activities restricted by the Non-Competition provisions of the 2010 Employment Agreement is likewise overly broad and vague, and would effectively bar Mr. Saban from pursuing or engaging in any employment position and earning a living, including Mr. Saban's position with SXC, for which Mr. Saban has pertinent training, industry experience and professional background;

(c)     The CVS Defendants either lack any sufficient "legitimate business interest" to warrant imposition of the restraints set forth in the Non-Competition provisions of the 2010 Employment Agreement, or such sweeping provisions are

far broader than necessary or appropriate to protect any legitimate interests that the CVS Defendants have; and

(d)     Mr. Saban does not have or maintain, nor will he use or disclose in connection with his SXC employment or otherwise, any confidential or proprietary information of the CVS Defendants such as might demonstrate a legitimate and protectable business interests worthy of protection through enforcement of the Non-Competition provisions of the 2020 Employment Agreement.

**ANSWER:**

Caremark denies the allegations in Paragraph 23.

## **Paragraph 24**

If the Non-Competition provisions of the 2010 Employment Agreement are enforced, Mr. Saban will be denied his right to work freely in his chosen field, one to which he has devoted his entire career.

**ANSWER:**

Caremark denies the allegations in Paragraph 24.

## **WHEREFORE Paragraph**

WHEREFORE, Plaintiff Joel Saban hereby respectfully requests the entry of a declaratory judgment in his favor and against the CVS Defendants:

(a)     Finding and declaring that the Non-Competition provisions of the 2010 Employment Agreement, in their entirety, are illegal, overbroad, unenforceable, void and violate public policy;

(b)     Finding and declaring that the Non-Competition provisions of the 2010 Employment Agreement are illegal, overbroad, unenforceable, void and violate public policy insofar as the same might be applied to preclude or limit Mr. Saban's employment with SXC;

(c)     Setting the Non-Competition provisions of the 2010 Employment Agreement aside, wholly, in material part, or

as the same might be applied specifically to Mr. Saban's employment with SXC; and

(d)     Granting Mr. Saban such other or further relief in his favor and against the CVS Defendants as this Court may deem fair, just and equitable in the premises.

**ANSWER:**

Caremark denies that Saban is entitled to any of the relief requested in the unnumbered WHEREFORE Paragraph and further denies that Saban is entitled to any relief whatsoever.

## AFFIRMATIVE DEFENSES

Defendants/Counterclaim-Plaintiffs, Caremark Rx, L.L.C., CVS Pharmacy, Inc. and Caremark, L.L.C. (collectively, "Caremark"), for their affirmative defenses to Plaintiff/Counterclaim-Defendant's ("Saban") Second Amended Complaint, hereby state as follows, and do not assume any burdens of proof related to these defenses, affirmative or otherwise, that would otherwise fall on Saban:

### First Affirmative Defense

1.     Caremark asserts that Saban's claims are barred, in whole or in part, under the doctrine of unclean hands.

2.     In support of this affirmative defense, and as further detailed in Caremark's Verified Counterclaims against Saban, Caremark states that Saban received significant financial incentives from Caremark meant to encourage his continued employment with and commitment to Caremark's business.

3.      Saban readily accepted the financial incentives Caremark provided. At the time of his resignation, Saban's annual salary was $343,200.

4.      In addition, Saban received numerous bonuses, awards of cash, stock grants, and stock options over the course of his employment. On or around March 15, 2010, Saban received a bonus of $222,952. Over the final three years of his employment at Caremark, Saban received approximately $445,936 in bonus money. Further, in the two months before he resigned his employment at Caremark, between February 18 and March 22, 2010, Saban exercised $492,282 worth of stock options and restricted stock units ("RSUs"). In total, from 2007 through the date of his resignation, Saban exercised $2,699,707 worth of stock options, RSUs, and other types of stock-based awards.

5.      Saban signed restrictive covenants in conjunction with the receipt of these stock-based awards.

6.      Despite the restrictive covenants he signed, and notwithstanding his fiduciary obligations to Caremark, Saban engaged in the unlawful acts of downloading, installing, and running unauthorized "Delete Files Permanently" and "Clear All History" software on his protected Caremark computer on his last day in the office as a Caremark employee. At the time he ran those unauthorized programs, he inserted a portable data storage device into his computer's USB drive. Caremark is still in the process of restoring deleted files and determining which files were loaded onto that portable data storage device.

7.      Prior to downloading and running the programs, Saban also sent various spreadsheets with highly confidential and proprietary information to his personal email account. Among the types of spreadsheets he forwarded to his personal account were documents regarding Caremark's corporate strategies, forecasted financial performance, budget analyses, financial statements, operating income, pricing strategies, and rebate analyses.

8.     Upon information and belief, he gave or will give the information contained therein to SXC or has used or will use such information in his new employment with SXC. Saban has clearly engaged in misconduct by unlawfully confiscating Caremark's confidential and proprietary information, installing and running unauthorized software on his computer, and resigning to accept employment with SXC, Caremark's direct competitor.

9.     In light of his improper conduct, Caremark asserts that Saban is barred by the doctrine of unclean hands from seeking any equitable relief whatsoever.

## Second Affirmative Defense

Caremark reserves its right to add additional affirmative defenses as its investigation and discovery continues.

## VERIFIED COUNTERCLAIMS FOR INJUNCTIVE AND OTHER RELIEF

For its verified counterclaims against Plaintiff/Counterclaim Defendant Joel Saban ("Saban"), Defendants/Counterclaim Plaintiffs, Caremark Rx, L.L.C. ("Caremark Rx"), CVS Pharmacy, Inc. ("CVS"), and Caremark, L.L.C. (collectively, "Caremark") by its attorneys, state as follows:

### Nature of the Case

1.     This is an action to obtain relief under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.* and for injunctive relief pursuant to Fed R. Civ. P. 65 to enforce limited restrictive covenants in a Non-Competition Agreement between Caremark and its former high-level executive Saban, to enjoin Saban's violation of the Illinois Uniform Trade Secrets Act, 765 ILCS 1065/1, *et seq.*, and to remedy Saban's breaches of fiduciary duty (including the duty of loyalty).  In a blatant and open breach of the Non-Competition Agreement, Saban resigned from Caremark and accepted employment with SXC Health Solutions, Inc. ("SXC"), a direct competitor of Caremark.  In addition, shortly before resigning, Saban sent

certain confidential and proprietary documents containing Company trade secrets to a personal email account. Moreover, less than one week before his resignation, Saban installed and ran two computer programs on his Caremark-issued computer: "Delete Files Permanently" and "Clear All History," in an obvious attempt to cover his tracks. Neither of those programs was authorized for use by Company employees. Saban has misappropriated Caremark's confidential and proprietary trade secrets and has used or will soon use these trade secrets in his new position at SXC. Unless enjoined by the Court, Saban will continue to violate Caremark's contractual, statutory, and common law rights and cause irreparable injury to Caremark's business.

**The Parties**

2.      Caremark Rx, L.L.C. is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Nashville, Tennessee. Caremark Rx, L.L.C. is the successor to Caremark Rx, Inc. In connection with a March 2007 merger involving Caremark Rx, L.L.C. and CVS Corporation, Caremark Rx, L.L.C. was merged into a subsidiary of CVS Corporation, and CVS Corporation was renamed CVS Caremark Corporation. The surviving entity and successor to Caremark Rx, Inc. following the merger is Caremark Rx, L.L.C., one of the Defendants-Counterclaim Plaintiffs in this case. Caremark Rx, L.L.C. has one member – CVS Pharmacy, Inc., one of the Defendant/Counterclaim Plaintiffs in this case – and CVS Caremark Corporation owns 100% of CVS Pharmacy, Inc.'s stock. Caremark LLC, formerly known as Caremark Inc., is a California limited liability company with its principal place of business in Tennessee and whose sole member is Caremark Rx, L.L.C. CVS Pharmacy, Inc. is a Rhode Island corporation with its principal place of business in Rhode Island.

3.      Saban is a citizen of Illinois and resides in Buffalo Grove, Illinois.

**Jurisdiction and Venue**

4.      This Court has personal jurisdiction over Saban because he is a citizen of Illinois, transacts business in Illinois, and has breached and will continue to breach contractual obligations to Caremark in Illinois.

5.      This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Caremark raises a claim under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(g).  The Court further has supplemental jurisdiction over the state law claims that Caremark raises against Saban pursuant to 28 U.S.C. § 1367 because these state law claims are related to Caremark's CFAA claim in that they form part of the same case or controversy.

6.      This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and Caremark is not a citizen of the same state as Saban.  CVS Pharmacy, Inc. is a Rhode Island corporation with its principal place of business in Rhode Island.  Therefore, CVS Pharmacy, Inc. is a citizen of Rhode Island. CVS Pharmacy, Inc. is the sole member of Caremark Rx, L.L.C.  Therefore, Caremark Rx, L.L.C. is a citizen of Rhode Island.  Caremark Rx, L.L.C. is the sole member of Caremark, L.L.C.  Therefore, Caremark, L.L.C. is a citizen of Rhode Island.  Diversity of citizenship exists because Saban is a citizen of Illinois and the Defendants/Counterclaim Plaintiffs are citizens of Rhode Island.

7.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 because the claims arise out of incidents occurring in this judicial district and because Saban resides or conducts business in this judicial district.

### The Business of Caremark

8.      Caremark currently employs over 15,000 people located across the country.  The Company is a leading provider of prescription benefit services, serving millions of plan participants.

9.      Caremark provides comprehensive drug benefit services to over 2,000 health plan sponsors and their plan participants throughout the United States. Caremark's clients include corporate health plans, managed care organizations, insurance companies, unions, federal and state governmental agencies, and other funded benefit plans.  Caremark's pharmacy benefit management services are designed to deliver the most effective and appropriate medicines while also providing cost savings to its clients.

10.      Caremark also places a premium on convenience, offering plan participants the choice of obtaining their medications at one of approximately 60,000 participating local retail pharmacies, which amounts to approximately 99 percent of all retail pharmacies in the United States, and/or through Caremark mail service pharmacies for home delivery of prescription drugs.  Caremark's parent company, CVS Caremark Corporation, operates one of the largest chains of retail pharmacies in the United States.

11.      Competition in the pharmacy benefits management and related benefits services industry is intense.  Aside from Caremark, several major organizations offer pharmacy benefit services on a national scale, including Medco and Express Scripts, Inc.  Participants in this industry are called "pharmacy benefit management" companies, or "PBMs."  In addition, companies like Saban's new employer, SXC, offer a range of services nearly identical to those offered by Caremark and other national PBMs.  Caremark is able to differentiate itself from PBMs and others in the industry by its ability to provide its clients with superior pricing and benefits programs.

12.      Caremark contracts with many different types of retail pharmacies, including chains, independent pharmacies, clinic pharmacies, long-term care pharmacies, and hospital pharmacies in administering the prescription drug programs of the plans.  Caremark's business and contractual relationships with retail pharmacies are vital to Caremark's business.

13.     Caremark pays retail pharmacies for dispensing prescription drugs (both generic and brand-name drugs) to members of Caremark's health plan clients, less a transaction fee. Caremark in turn charges its clients for prescription drugs dispensed by retail pharmacies to their plan members and for other services.  Caremark enters into national network agreements with retail pharmacies for the dispensing of prescriptions to members of Caremark's client plans. Caremark also enters into client-specific network agreements with retail pharmacies on behalf of individual client plans.  All of the terms of these contracts are extremely confidential.

14.     In addition, Caremark enters into agreements with manufacturers of brand pharmaceutical drugs for rebates that Caremark receives upon the dispensing of prescription drugs to members of client plans.  The terms of the rebates, which Caremark receives for brand prescription drugs, vary among the pharmaceutical companies.  Rebates are an important piece of Caremark's business and profitability models.   One of Saban's main responsibilities at Caremark was to negotiate rebates with pharmaceutical companies for brand drugs, and in that capacity, Saban has acquired a great deal of confidential and proprietary information regarding Caremark's rebate agreements.   In fact, Saban was the primary signatory to most of the Caremark's rebate agreements with pharmaceutical companies.

15.     The very nature of how Caremark competes in the industry is heavily weighted towards price.  Caremark's costs of goods sold, which are the result of negotiations between Caremark and prescription drug manufacturers and wholesalers, and Caremark and retail pharmacies, are a very substantial component of Caremark's competitive advantage.

**Saban's Knowledge of Caremark's Brand Drug Rebate Trade Secrets and Confidential Information**

16.     Caremark contracts with both wholesalers and pharmaceutical companies to acquire prescription drugs which are then dispensed to its clients.  The prices that Caremark pays

for these prescription drugs are determined pursuant to confidential negotiations between Caremark and the wholesaler or pharmaceutical company. There is a difference, on an aggregate basis, between Caremark's costs in acquiring these prescription drugs and the amounts charged by Caremark to its clients for those drugs. These differences are an important factor in determining Caremark's profits.

17. Caremark's negotiations with prescription drug manufacturers for rebates constitute confidential and proprietary information. These rebates are a critical part of Caremark's business model and a key aspect of the Company's ability to generate revenue and remain profitable. Because Caremark's negotiated rebate agreements are kept in the strictest confidence, Caremark can maintain a competitive advantage over its competitors, and it is further able to pass along additional cost savings to its end clients.

18. Very few Caremark employees are aware of the terms of Caremark's actual rebate agreements for specific drugs, the negotiations and strategies by which those rebates were obtained, and the terms and conditions of Caremark's other contracts with prescription drug manufacturers. Saban was the Caremark executive tasked with negotiating rebate contracts with pharmaceutical companies for brand and specialty drugs and further was responsible for developing the strategy of how to optimize value from pharmaceutical manufacturers while at the same time ensuring Caremark's ability to deliver the lowest cost to its clients. As such, he has a deep and abiding knowledge and understanding of Caremark's rebates, negotiations and overall strategies.

19. Very few employees of Caremark regularly communicate with prescription drug manufacturers or have access to Caremark's confidential and proprietary negotiating strategies and other confidential and proprietary information during the course of the negotiations. Saban

was one such employee and led most of the Caremark teams responsible for the negotiations for rebates with pharmaceutical companies for brand and specialty prescription drugs.

20.    The terms of a rebate vary from contract to contract and from manufacturer to manufacturer.  Variations in terms can include the percentage of the rebate, the market share of prescription drugs that must be dispensed in order to warrant the rebate, the rebate structure, and what triggers the rebate, among others.  Additional rebates are sometimes available, including rebates whereby Caremark receives additional consideration for the market share of drugs purchased or the percentage of Caremark's clients' plan members who use certain drugs.  Taking clinical considerations into account, Caremark further must determine how many preferred drugs are in each therapeutic class, which in turn drives the level of rebates.  The terms of the rebates that pharmaceutical companies pay Caremark are the subject of intense negotiations, and Caremark individually negotiates with each of the approximately ninety drug manufacturers with which it does business.

21.    Information regarding Caremark's rebates with particular pharmaceutical companies are highly confidential.  There is fierce competition between the various PBMs— many of whom offer the exact same services for their clients—for contracts with the pharmaceutical companies given that a significant portion of a PBM's revenues are from rebates. If another PBM, such as SXC, knew the terms of the rebate that Caremark has in its contract with a particular pharmaceutical company, it could improve its own terms and obtain more favorable contracts with the pharmaceutical manufacturers, and Caremark's market advantage would be irretrievably lost.    Further, if a competitor were able to obtain better rebates from a pharmaceutical manufacturer, the competitor could, in turn, offer more lucrative contract terms to client plans, thereby taking business from Caremark.

22.     Caremark negotiates discounts on the purchase price with manufacturers of generic drugs for both its PBM business and the CVS retail pharmacy chain.  Because Caremark is a very large purchaser of generic drugs and there are, in most situations, multiple manufacturers of the same generic drug, Caremark is able to negotiate favorable discounts with many generic drug manufacturers.  Over the years, the Company has improved its ability to obtain advantageous acquisition costs by, for example, establishing and maintaining relationships with generic drug manufacturers, studying the developments and trends in the generic drug market, and remaining aware of anticipated new product launches.

23.     The terms of Caremark's contracts with generic drug manufacturers, and, specifically, information regarding the size and terms of the discounts, are highly confidential and constitute trade secrets.  Although Saban did not negotiate these discounts and pricing terms with generic drug manufacturers, he worked closely with the Caremark employees who did so and has intimate knowledge of the terms of Caremark's negotiation strategies, discounts, and other pricing terms relating to Caremark's purchases of generic drugs.

24.     It follows that by virtue of his responsibilities and position within Caremark, Saban has intimate knowledge of the terms of Caremark's contracts with wholesalers and pharmaceutical brand drug manufacturers for the purchase of brand drugs for use in Caremark's mail order facilities and CVS retail pharmacies.  Saban received copies of the most recent contracts during his employment at Caremark.  As a result, Saban has intimate knowledge of Caremark's acquisition costs of all prescription drugs dispensed through either Caremark's PBM operations or the more than 7,000 CVS/pharmacy retail stores.

25.     If a prescription drug manufacturer or wholesaler were privy to pricing information in a contract between Caremark and another manufacturer or wholesaler, Caremark would be at a substantial competitive disadvantage.  The other manufacturer or wholesaler would

24

use the information to leverage more advantageous financial provisions. In addition, if Caremark's confidential rebate and discount provisions were known by clients, large clients could approach pharmaceutical companies directly to negotiate their own rebates, cutting Caremark out of the process entirely. Given the importance of rebates and discounts on Caremark's business model, such an occurrence would severely and irreparably harm the Company.

26. Caremark has devoted significant time and expense to developing its roster of clients, and has made an equally substantial investment of time and money in negotiating with various drug manufacturers. Only a select group of individuals are allowed to talk to the pharmaceutical companies and few people have access to the information during the course of the negotiation.

27. It is uncommon for a health plan to use more than one PBM at one time. Thus, once Caremark establishes a client relationship by completing a sale, Caremark often becomes the exclusive provider of that client's pharmacy benefits management program.

28. The success of Caremark's business depends in large part on the development, use, and protection of certain confidential and proprietary information, particularly with respect to Caremark's prescription drug costs, relationships with pharmaceutical companies, pricing modules and methodologies, client pricing formulae and structures, its projected profitability models for each client, and Caremark's overall pharmaceutical products acquisition cost models. Saban has intimate knowledge of trade secrets and other proprietary information of Caremark in all of these areas. A competitor with knowledge of this information could harm Caremark's business model and undermine Caremark's business.

29. Caremark has implemented security measures to ensure that its confidential information and trade secrets are not used or disclosed outside of Caremark. Information stored

in Caremark's computer systems is password-protected with access limited to employees on a need-to-know basis. Users are prohibited from sharing their user id and/or passwords with others. Remote access to the computer system is permitted only through company-approved controls. Caremark employees are prohibited from using personal email accounts such as yahoo or gmail to conduct company business, and they are prohibited from using such accounts to email company confidential data to themselves.

30.    In addition, Caremark employees with access to sensitive information are required to sign agreements in which they acknowledge that they have read and understood Caremark's Confidential Information Policy, and wherein they agree not to use or disclose such information unless such use or disclosure is for Caremark's business purposes only. Employees must acknowledge that they: (i) will not disclose, make available or discuss any confidential information with anyone who does not have an authorized, business need to know the information; (ii) will not leave confidential information displayed on any unattended computer monitor; (iii) will store hard copies of all confidential information (or computer disks that contain such information) in a secured location; and (iv) will dispose of the hard-copy of all confidential information in a manner appropriate with the sensitivity of the information. Caremark mandates that employees agree to and comply with these rules and subjects non-complying employees to appropriate disciplinary action, up to and including termination of employment.   As an employee with access to a great deal of sensitive, confidential, and proprietary information and trade secrets, Saban was required to and did in fact sign a Confidential Information Policy acknowledgment, a copy of which is attached as Exhibit 2.

31.    Caremark employees are required to attend annual "Integrity" training, which further reinforces the Company's expectation that employees keep all proprietary information

and trade secrets confidential. Saban participated in annual Integrity training, most recently in March of 2010.

33. Only a very small percentage of employees at Caremark, and only those with a need to know, have access to the Company's rebate contracts with pharmaceutical manufacturers. The original copies of the contracts are kept in locked file cabinets in the Legal Department. Scanned copies of the contracts with rebate information are maintained on secured internal networks to which only certain employees have access. As the head of the department responsible for negotiating these contracts, Saban was one of the employees with free access to such agreements and information.

33. Not only are rebate and other contracts with pharmaceutical companies maintained in secure locations within Caremark but they generally also contain confidentiality provisions requiring both Caremark and the pharmaceutical company to keep the terms of the contract—particularly the terms of the rebates—confidential. Under oath, in another proceeding, Saban has acknowledged the confidentiality provisions included in virtually all of these contracts with pharmaceutical companies.

34. The Company has devoted significant time and expense to developing its negotiating strategies for acquiring financially advantageous rebates and discounts from manufacturers and developing relationships with account managers and others responsible for contracting on behalf of prescription drug manufacturers. As the lead Caremark negotiator over the past ten years, Saban has negotiated hundreds of contracts with drug manufacturers on behalf of Caremark and was in regular contact with the largest and most significant drug manufacturers in the world, including Pfizer, AstraZenaca, and Wyeth, concerning any issue that would materially impact Caremark's business relationships with those manufacturers. Saban has

formed personal relationships with high-level pharmaceutical company employees responsible for negotiating and contracting with Caremark.

35.     Even more critically, because of Saban's tenure and leadership at Caremark, he has intimate familiarity with the rebate terms that Caremark has with all of the pharmaceutical companies as well as Caremark's negotiating strategies with those companies.  The harm that would be caused if a competitor, such as SXC, obtained information regarding the rebates, discounts, and other pricing terms that Caremark has negotiated with pharmaceutical companies would be severe, immediate, and irreparable.  Knowledge of Caremark's rebates would spur SXC (or any other PBM) to renegotiate its own contracts with pharmaceutical companies, undermining Caremark's market advantage.  In addition, SXC could use improved contract terms with pharmaceutical companies to compete with Caremark in obtaining client business.

36.     Caremark also enters into data sales contracts and other contracts with IMS and Walters Kluwer, which in turn contracts with certain pharmaceutical drug manufacturers. Pursuant to these agreements, Caremark provides market information or other data to pharmaceutical drug manufacturers for a fee.  The terms of these agreements are confidential and proprietary and trade secrets of Caremark.  Only a limited number of Caremark employees had knowledge of the terms of these contracts; Saban was one such employee.

**Saban's Responsibilities Regarding Caremark's Confidential MAC Pricing Lists**

37.     Saban also had supervisory responsibilities over the Caremark group responsible for Maximum Allowable Cost ("MAC") pricing lists, one of the most important and confidential aspects of Caremark's business operations.  Among other things, the MAC pricing lists sets forth the amount that Caremark reimburses retail pharmacies for certain drugs.

38.     There is often a difference, on a per prescription basis, between prices charged by Caremark and the prices that Caremark pays the retail pharmacies for prescription drugs

dispensed by those retail pharmacies. These differences are a key factor in determining Caremark's profits. The prices that Caremark pays the retail pharmacies and that Caremark charges its plans, as well as other components of the retail pharmacy and client plan contracts and related negotiations, are confidential and proprietary trade secrets of Caremark and maintained as such by Caremark. Detailed knowledge of this information is held by only a few select employees of Caremark. Saban was one such employee.

39.     By virtue of his position, Saban has knowledge of the retail pharmacy reimbursement rates for brand, specialty, and generic prescription drugs.

40.     Knowledge of the pricing information in any contract between Caremark and a retail pharmacy chain by (1) another retail pharmacy chain, (2) a client plan of Caremark, or (3) a competitor of Caremark in the PBM industry would harm Caremark's business model, jeopardize profits, and cause irreparable injury to Caremark. Caremark would be at a substantial competitive disadvantage in contract negotiations with any retail pharmacy or client plan that had access to this information. Any competitor of Caremark could use this information to undercut Caremark's pricing and take business from Caremark.

41.     The information in the contracts and related negotiations between Caremark and retail pharmacies are confidential and proprietary, and divulgence of such information by retail pharmacies to clients, other retail pharmacies, or competitors is grounds for termination of a contract.

42.     With regard to drug pricing, the methodology by which Caremark assigns a price to a drug on its MAC list is a confidential and proprietary trade secret. In connection with this methodology, Caremark has developed complex computer programs and algorithms (specifically designed and built in-house) to evaluate a number of factors and set a weighted overall discount

rate for generic prescription drugs. Caremark employs a small group of highly-trained employees to model and analyze MAC pricing.

43. Additionally, the MAC lists themselves contain confidential and proprietary information including the prices at which Caremark reimburses pharmacies and the prices it sets for each generic drug. This information is known by only a select group of Caremark employees; Saban is within that group.

44. At Caremark, Saban was responsible for overseeing the employees who handled the creation and maintenance of the MAC pricing lists. In addition, he was a member of the MAC List Committee, which discussed proposed MAC prices and determined whether or not Caremark should approve suggested prices. For MAC price changes, Saban ultimately was responsible for approving target prices, which determined whether particular price changes would be made to MAC lists. As a critical member of the committee, Saban routinely participated in calls evaluating MAC price launches and changes.

45. Only a select few employees of Caremark are familiar with Caremark's MAC pricing methodology, negotiations with retail pharmacies concerning MAC pricing, and the MAC prices paid by Caremark to reimburse retail pharmacies. Saban was one such employee.

46. Caremark has devoted significant time and expense to developing its MAC pricing methodologies.

47. The methodology that Caremark employs to develop and structure its MAC pricing is confidential and proprietary information.

48. Given his position on the MAC List Committee and his supervision of employees engaged in day-to-day maintenance of the MAC pricing lists, Saban is very familiar with the confidential methodology and processes by which Caremark determines its MAC pricing. Further Saban was privy to the acquisition costs of the drugs dispensed by CVS retail

pharmacies. Should SXC obtain this confidential information, it would have an unfair advantage in negotiating payments with pharmacies, including CVS retail pharmacies.

### Saban's Responsibilities Regarding Caremark's Confidential and Proprietary Information Relating to Client Contracts

49.     The terms of Caremark's agreements with its clients are confidential. If a competitor were to know the terms of Caremark's contracts with its clients, the competitor would be in a position to unfairly underbid Caremark by offering the same prescription drug benefit services on terms more financially advantageous to the client.

50.     Because of Saban's intimate familiarity with rebate terms and strategy, he was also involved in discussions with and about client contracts. As to discussions with clients, Saban served as Caremark's liaison with clients regarding a variety of topics into which clients might inquire. For example, when Caremark received questions from clients about rebates, Saban met with and explained the rebate process and provided information about rebate guarantees during those meetings. In addition, Saban participated in bids to obtain new client business, presenting to current and prospective clients the ways in which Caremark could better manage their prescription drug benefit. Because of this involvement, Saban had substantial visibility to Caremark's pricing strategies with its clients.

51.     Internally, Saban participated in decisions regarding whether client requests for special rebate terms would be implemented. For example, a client's desire for a unique rebate or pricing structure required analysis as to how implementing such unique terms would affect current rebate agreements in place with pharmaceutical companies. As the Caremark executive with the most knowledge of the Company's rebate contracts with pharmaceutical companies, Saban played a key role in decisions regarding whether such terms should be implemented in a client agreement.

52.     In addition, Saban was heavily involved in executive-level meetings led by the Company's Underwriting Department.   Among other things, the Underwriting Department assembles the financial data underlying Caremark's bids for prescription drug benefit management services to current and prospective clients.

53.     Approximately once a week, Saban participated in an Executive Underwriting phone call with the most senior Caremark executives, including the Company's Chief Executive Officer and President and a select number of Executive and Senior Vice Presidents, regarding those PBM client contracts that generated at least $100 million in revenue on an annual basis. These are Caremark's most valuable client contracts.   As part of these phone calls, Saban was privy to financial information and underwriting analysis relating to each of these clients, participated in conversations regarding pending or contemplated transactions, and generally helped formulate Caremark's strategy with respect to each such client.   Additionally, these calls addressed profit margins, financial forecasting, pricing strategies, and new business opportunities being pursued by Caremark vis-à-vis these clients.

54.     The information discussed and circulated at the weekly Executive Underwriting calls is extremely confidential.   As one of the executives on these calls, Saban had knowledge of, exposure to, and input into all of the highly sensitive topics discussed.   Were a competitor like SXC to obtain this information, it would know all of Caremark's current and contemplated strategies relating to clients, profits, pricing, and rebate contracting.   Such information in the hands of a competitor would permit that competitor to underbid Caremark to current and prospective high-value clients, taking business from the Company, and severely and irreparably harming Caremark's business and profitability as well as its client relationships.

55.     Saban had visibility to the process of setting Caremark's Generic Effective Rates ("GER") with its clients.  The GER is a type of guarantee that Caremark provides to its clients relating to the aggregate prices paid by clients for generic drugs.

56.     GERs are unique, highly confidential and proprietary pricing terms incorporated into Caremark's contracts with its clients.  Each client contract is specifically negotiated and highly confidential and among other things includes the specific negotiated terms of a GER.

57.     Saban was responsible for ensuring that Caremark achieved the GERs it had committed to providing its clients.  The GERs with Caremark's clients are confidential and, if leaked to a competitor, could harm Caremark because they reflect uniquely negotiated pricing terms and strategies.

## Saban's Responsibilities Regarding Caremark's Compliance with the Federal and Multi-State Consent Decrees

58.     In order to resolve litigation in which it was involved with certain state Attorneys General and the United States Attorney's Office for the Eastern District of Pennsylvania, Caremark entered into a multi-state and federal consent order, respectively.   In addition, Caremark entered into a Corporate Integrity Agreement with the Office of Inspector General of the United States Department of Health and Human Services ("OIG HHS").

59.     Saban was placed in a key role in monitoring Caremark's compliance with certain provisions of the consent decrees relating to Caremark's clinical programs.

60.     Given his role in overseeing a substantial portion of Caremark's compliance monitoring processes relating to Caremark's clinical programs, Saban has confidential information about Caremark's clinical programs and strategies.

61.     In addition, Saban also was responsible for approval of the quarterly reporting of "Manufacturer Payment Reports" as required by the consent decrees. These reports are required

to be sent to PBM clients with certain financial arrangements with Caremark. Saban approved what specific data would be reported to these clients, within a stated range, each quarter. In part because of these responsibilities, Saban had access to extensive confidential information regarding the financial arrangements between Caremark and certain clients for whom pharmaceutical drug rebates were passed through by Caremark.

### Saban's Knowledge of Caremark's Budgeting and Financial Forecasting

62.     Saban was deeply involved in reviewing the Company's financial data and had visibility to Caremark's entire operational budget for its PBM business. As part of that process, Saban was exposed to and familiar with all of Caremark's sources of revenue and expenses for the PBM business. Saban's specific responsibilities in this process included determining the margin components of Caremark's operational PBM budget.

63.     In addition, Saban also was actively engaged in budget forecasting initiatives and maintained the annual revenue goals for Caremark's Trade and Retail Networks Departments year after year.

64.     Given his role in setting and monitoring the Company's PBM budget and his responsibility for forecasting the Trade and Retail Networks' revenue goals, Saban had unique exposure to all operational data supporting Caremark's financial operations and profitability.

65.     In addition, approximately once a month Saban participated in a meeting of a select group of Caremark executives regarding the Company's overall operations. Among the highly confidential topics discussed were financial data, clinical programs, costs of clinical programs, operational costs, profitability, and budgeting.

## Saban's Employment with Caremark

66.     Caremark hired Saban as a senior finance analyst in 1997.  Thereafter, he joined the Trade Relations Department, first as Director, then Vice President, and finally a Senior Vice President Industry Relations & Analysis.  Saban held that position from March 25, 2006 until he resigned on April 20, 2010.

67.     As Senior Vice President Industry Relations & Analysis for the Trade Relations Department, Saban reported to Rudy Mladenovic, Executive Vice President of Industry Relations, from March 2004 to January 2009 and more recently, to Jon Roberts, Executive Vice President, Rx Purchasing, Pricing and Network Relations, from January 2009 until Saban's recent resignation.

68.     In his capacity as a Senior Vice President, Saban was responsible for all contracts with pharmaceutical companies relating to brand-name prescription drugs.  This responsibility extended to the entire Caremark PBM operation as well as the CVS retail pharmacy chain.  His primary duties were the development and execution of negotiating strategies for individual pharmaceutical companies and personally negotiating many of the contracts with pharmaceutical manufacturers for brand-name prescription drugs.  For those negotiations in which he did not personally partake, Saban supervised the individual members of the Caremark negotiating team. Among the most critical terms and conditions that Saban was responsible for negotiating were those relating to the rebates and discounts that Caremark would receive upon the dispensing of the pharmaceutical product.

69.     Due to his personal involvement in these negotiations, Saban developed significant contacts and relationships on behalf of Caremark with high-level representatives at major pharmaceutical drug manufacturers across the nation.  Saban was one of the select few employees at Caremark familiar with the specific terms and conditions of the rebates and

discounts associated with the prescription drugs acquired by Caremark from pharmaceutical manufacturers.

70.     Saban possesses detailed knowledge of a great deal of Caremark's confidential and proprietary information, particularly related to rebates, discounts, MAC prices, profitability, client relationships, and negotiating strategy.  For example, he is intimately familiar with the strategies used by Caremark to negotiate brand and specialty drug pricing with prescription drug manufacturers, MAC pricing methodology and strategy, as well as exposure to retail pharmacy reimbursement rates for brand, specialty and generic prescription drugs, the acquisition and buying histories of prescription drugs from manufacturers and wholesalers, details concerning Caremark's business relationships with prescription drug manufacturers, the prices, rebates, and discounts offered by prescription drug manufacturers to Caremark, the Company's largest and most valuable clients, the specific strategies and financial analyses related to those clients, and the entire budget and financial forecast for Caremark's PBM business. All of this information is confidential and proprietary and constitutes trade secrets.

71.     At the same time, Saban had responsibility over the maintenance and updating of MAC pricing lists.  As a member of the MAC List Committee, he was personally involved in all discussions regarding changes to MAC pricing and had ultimate authority for approving changes to MAC pricing lists.   Saban's familiarity with MAC pricing lists, the confidential and proprietary methodology and formulae used to determine MAC pricing, and the confidential and proprietary strategies employed in creating MAC pricing lists are information that belongs to Caremark, and all play critical roles in determining Caremark's profitability.

72.     On the client side, Saban's duties included engaging in regular discussions with current and potential clients regarding rebates and services that Caremark could provide to the

client. Saban's role in securing new and existing business gave him considerable visibility to client relationships and the financial terms of contracts with clients.

73. Under oath, Saban previously admitted the wide-ranging topics on which he had access to confidential and proprietary information and trade secrets, including information regarding rebates and fees from pharmaceutical manufacturers; communications with pharmaceutical manufacturers; policies, procedures, and practices related to pricing the pricing of pharmaceutical drugs; policies, procedures, and practices related to retaining and/or passing onto plan clients any form of cost savings, including rebates and discounts.

74. Caremark has taken repeated steps to ensure that its confidential and proprietary information and trade secrets known by Saban was kept confidential. On March 12, 2007, Saban signed a memorandum regarding the merger of Caremark and CVS providing that Saban's employment would be transferred from Caremark to CVS in accordance with an attached Term Sheet. Saban later initialed a document entitled "Term Sheet" containing a two-year non-competition clause, a two-year non-solicitation clause, and a non-disclosure clause, which does not contain a time limit.

75. On May 6, 2008, Saban signed "2008 Employee Non-Competition, Non-Disclosure and Developments Agreement." This contract contained a two-year non-competition clause, a two-year non-solicitation clause, and a non-disclosure of confidential information clause which did not contain a time limit.

76. On June 3, 2009, Saban signed a document entitled "2009 Employee Non-Competition, Non-Disclosure and Developments Agreement." This contract contained a two-year non-competition clause, a two-year non-solicitation clause, and a non-disclosure of confidential information clause which does not contain a time limit.

77.    On December 14, 2009, Saban signed an "Employment Agreement," effective from March 22, 2010 until March 21, 2012. This contract contained a one-year non-competition clause, a one-year non-solicitation clause, and a non-disclosure of confidential information clause, which contained no time limit.

78.    The Non-Competition provision of the Employment Agreement signed by Saban in December 2009 provides, in relevant part:

> <u>Non-Competition</u>. During the Executive's employment and during the Non-Competition Period (defined below), Executive will not, directly or indirectly, engage in Competition with the Company. "Competition" shall mean engaging in any activity for a Competitor of the Company, whether as a principal, agent, partner, officer, director, employee, independent contractor, investor, consultant or stockholder (except as a less-than one percent shareholder of a publicly traded company) or otherwise. A "Competitor" shall mean any person, corporation or other entity (and its parents, subsidiaries, affiliates and assigns) doing business in any geographical area in which the Company or any of its subsidiaries or affiliates are doing or have imminent plans to do business, and which is engaged in the operation of: (a) a retail business which includes or has imminent plans to include a pharmacy *(i.e.* the sale of prescription drugs) as an offering or component of its business, including but not limited to, chain drug store companies such as Walgreen Co. and Rite Aid Company, mass merchants such as Wal-Mart Stores, Inc. and Target Corp., and food/drug combinations such as The Kroger Co. and Supervalu Inc.; and/or (b) a business which includes or has imminent plans to include mail order prescription, specialty pharmacy and/or pharmacy benefits management or any other services offered by Caremark Rx, LLC as an offering or component of its business, such as Medco Health Solutions, Inc. or Express Scripts, Inc., and/or (c) a business which includes or has imminent plans to include offering, marketing or the sale of basic acute health care services at retail or other business locations, similar to the services provided by MinuteClinic, LLC (and excluding hospitals, private physicians' offices or other businesses dedicated to the direct provision of health care services). During Executive's employment by the Company and during the Non-Competition Period, Executive will not, directly or indirectly, engage in any activity that involves providing audit review or other consulting or advisory services with respect to any relationship between the Company and any third party. The "Non-Competition Period" shall be the 12-month period following the termination of Executive's employment with the Company for any reason, <u>provided that</u> the Company may, in its sole discretion, extend the length of the Non-Competition Period in accordance with Section 4(c)(iv) above.

(Exhibit 1 ¶ 5(a)).

79.     The Non-Disclosure of Confidential Information provision of the Employment

Agreement signed by Saban in December 2009 provides, in relevant part:

(c)     Non-Disclosure of Confidential Information.
          (i) Executive will not at any time, whether during or after the
termination of Executive's employment, reveal to any person or entity any of the
trade secrets or Confidential Information concerning the organization, business, or
finances of the Company or of any third party which the Company is under an
obligation to keep confidential, except as may be required in the ordinary course
of performing Executive's duties as an employee of the Company.    The
Company's Confidential Information includes but is not limited to non-public
information such as computer code generated or developed by the Company;
software or programs and related documentation; strategic compilations and
analysis; strategic processes; business or financial methods, practices and plans;
non-public pricing; operating margins; marketing, merchandising and selling
techniques and information; customer lists; details of customer agreements;
pricing arrangements with drug manufacturers; pharmacy reimbursement rates;
expansion strategies; real estate strategies; operating strategies; sources of supply;
employee compensation and benefit plans, and patient records (collectively,
"Confidential Information").    Executive shall keep secret all such matters
entrusted to him/her and Executive shall not use or attempt to use any
Confidential Information on behalf of any person or entity other than the
Company, or in any manner which may injure or cause loss or may be calculated
to injure or cause loss, whether directly or indirectly, to the Company.

          (ii) Further, during his/her employment, Executive shall not make,
use or permit to be used any notes, memoranda, reports, list, records, drawings,
sketches, specifications, software programs, data, documentation or other
materials of any nature relating to any matter within the scope of the business of
the Company or concerning any of its dealings or affairs otherwise than for the
benefit of Company. Executive shall not, after the termination of his/her
employment, use or permit to be used any such notes, memoranda, reports, lists,
records, drawings, sketches, specifications, software programs, data,
documentation or other materials. All of the foregoing shall be and remain the
sole and exclusive property of the Company and, immediately upon the
termination of his/her employment, Executive shall deliver all of the foregoing,
and all copies thereof, to the Company at its main office.

(Exhibit 1 ¶ 5(c)(i) & (ii)).

80.     The parties agreed that the Employment Agreement would be "governed by and

construed and interpreted in accordance with the laws of Rhode Island"  (Exhibit 1 ¶ 7(h)(i)).

Saban also recognized that his "obligations" under the Non-Competition Agreement would

"survive termination of [his] employment, regardless of the reason for such termination." (Exhibit 1 ¶ 7(h)). Further, Saban agreed that any breach by him of the Employment Agreement would cause Caremark "irreparable damage" and that he would "promptly reimburse [CVS] for all reasonable attorneys fees incurred by CVS in connection with obtaining such equitable relief or damages." (Exhibit 1 ¶ 6).

81.     On or about April 2, 2010, Saban's annual salary was increased to $343,200. Previously, in August of 2009, he had received a raise to $330,000, which itself constituted a raise over his April 2009 salary of $270,400. Over the final five years and three months of his employment, Saban's salary increased from $175,000 (January 1, 2005) to $343,200.

82.     In addition to his regular salary, Saban received annual bonuses. On or around March 15, 2010, Saban received a bonus of $222,952. Over the final three years of his employment at Caremark, Saban received approximately $445,936 in bonus money.

83.     Saban further received numerous awards of cash, stock grants, and stock options over the course of his employment with Caremark. In the two months before he resigned, between February 18 and March 22, 2010, Saban exercised $492,282 worth of stock options and restricted stock units ("RSUs"). In total, from 2007 through the date of his resignation, Saban exercised $2,699,707 worth of stock options, RSUs, and other types of stock-based awards. Saban signed restrictive covenants in conjunction with the receipt of these stock-based awards.

**Breaches of Non-Competition Agreements by Saban**

84.     Upon information and belief, Thursday, April 15, 2010 was Saban's last day in his Northbrook, Illinois Caremark office as a Caremark employee. He used personal days and was away from his office on Friday, April 16, 2010 and Monday, April 19, 2010.

85.     On or about April 19, 2010, Saban flew from Illinois to Boston, Massachusetts and then drove to Woonsocket, Rhode Island, home of Caremark's corporate headquarters.

86.    On or about April 19, 2010, Saban informed his supervisor, Jon Roberts, that he was resigning from Caremark, effective immediately.

87.    Saban subsequently informed three different Caremark employees, Dominic Gugliuzza, Erin Kirchhardt, and Tom Gibbons, that he had accepted a position with SXC, one of Caremark's competitors, and would hold the third highest position in that company.

88.    SXC is a direct competitor in precisely the area in which Caremark has developed its competitive edge—pharmacy benefits management programs and related services.  SXC offers its clients the exact same services and competes with Caremark for clients.  SXC has admitted that CVS Caremark is a competitor as recently as April 2010 in a presentation to SXC investors.  See April 2010 Presentation, attached hereto as Exhibit 3, on slide 13.  In addition, SXC's CEO, Mark Thierer, has recently made statements referring to the fact that he views Caremark as a competitor of SXC.  *See* Mike Colias, *SXC's Mark Thierer Shows Pharmacy Firepower*, Crain's Chicago Business, April 5, 2010 (quoting Mark Thierer, when asked about Caremark, as saying "we'll kick their ass.") (Exh. 4).

89.    SXC's website states that it "provides the broadest range of pharmacy tools technology, and expertise in the industry."  A true and correct copy of an electronic page of SXC's website is attached hereto as Exhibit 5.  SXC's website further states that SXC is "redefining pharmacy benefit management" by "providing clients with the flexibility and choice they need to effectively reduce their pharmacy spend and furnish better care to their members." *See id.*

90.    SXC also states that its "product offerings and solutions combine PBM software applications, Application Service Provider (ASP) processing services, and professional services designed for many of the largest organizations in the pharmaceutical supply chain, such as

pharmacy benefit managers, managed care organizations, self-insured employer groups, retail pharmacy chains, and state and federal government entities." *Id.*

91.     SXC's business is in direct competition with Caremark's business.  SXC and Caremark are in competition to provide the same types of services to clients, have directly competed for clients in the past, and are currently competing for the same business.  SXC has admitted as recently as April 2010 that CVS Caremark is one of its competitors.

92.     Like Caremark, SXC also engages in negotiations with prescription drug manufacturers.

93.     In his declaratory judgment action, Saban asserts that he intends to perform certain duties as the Executive Vice President Operations, which he expects will "include managing and overseeing the daily operations of SXC's mail-order and specialty pharmacy business segments for and on behalf of SXC, which business operations include providing pharmacy benefit management services to insurers, self-insured employers, union groups, governmental entities and other pharmacy benefit plan sponsors."  *See* Saban Complaint, attached hereto as Exhibit 6.

94.     If Saban is permitted to begin working for SXC, he and SXC will have an unfair competitive advantage against Caremark because Saban  will be able to use, and inevitably will disclose, his extensive and long-term knowledge of Caremark's confidential, proprietary and trade secret information.  Indeed, Saban and SXC will use Caremark's confidential pricing, rebate agreements with pharmaceutical companies, MAC pricing, prescription drug acquisition costs, profitability and revenue strategies, negotiating strategies, customer and client information, and marketing plans to outbid or underbid (as the case may be) Caremark and effectively take away current and prospective clients or customers from Caremark.  Such pricing and cost information is invaluable in the PBM industry.  Saban's and SXC's use of such knowledge

threatens Caremark's ability to retain existing and/or gain new clients and could be extremely harmful to Caremark's business.

95.     Given Saban's former high ranking position at Caremark, he will be unable to perform his duties as an Executive Vice President at SXC without using the massive institutional and specialized knowledge he has regarding nearly all parts of Caremark's PBM operations, profitability, and short-and long-term strategies confidential and proprietary information and trade secrets.

### Breaches of Non-Disclosure and Confidentiality Agreements and Fiduciary Duties by Saban

96.     Upon information and belief, April 15, 2010 was Saban's last day in the office as a Caremark employee.

97.     A forensic analysis of Saban's Caremark-issued laptop computer revealed that on April 14, 2010 at 9:47 a.m., using the internet search engine Google, Saban searched for "how to erase all" computer files using computer software.  Saban accessed the website http://www.morun.net on April 15, 2010 from his Caremark-issued laptop computer.  (Exh. 8, K. Mangin Affidavit).

98.     The website http://www.morun.net offers a "privacy suite" for purchase and download.  The privacy suite consists of the programs "Clear All History" and "Delete Files Permanently."

99.     Using http://www.morun.net, Saban downloaded and installed software programs entitled "Clear All History" and "Delete Files Permanently" onto his Caremark-issued laptop computer on April 15, 2010 at approximately 8:53 a.m. and 8:55 a.m., respectively.  (Exh. 8, K. Mangin Affidavit).

100.    Delete Files Permanently is a program that Caremark does not support, and it is not included on Caremark's computers issued to employees.

101.    According to www.deletefilespermanently.com, "Delete Files Permanently enables you to permanent [sic] delete files and wipe free space without anychance [sic] of recovery," making it "impossible for anyone to restore deleted information and track your computer use!"  "Delete Files Permanently is delete files software that allows you to permanently delete files without any possibility to recover them."

102.    The "Delete Files Permanently" software does not act on all of the files on a computer but rather requires the user to select which files he or she wishes to delete.  (Exh. 8, K. Mangin Affidavit).

103.    The forensic analysis of Saban's laptop computer revealed that he ran Delete Files Permanently twice on April 15, 2010, once at approximately 8:55 a.m., and once at approximately 2:20 p.m.  *Id*.

104.    In addition to running the program Delete Files Permanently on April 15, 2010, Saban also ran a program entitled "Clear All History" or "CAH.exe" on April 15, 2010.  "Clear All History has a duty to delete all your online activity traces.  It erases completely your browsing history, lists of visited pages, cookies, temporary internet files, lists of recent documents and all that may strike a blow at your privacy."  Download Clear All History, http://en.kioska.net/telecharger/telecharger-6466-clear-all-history (last accessed April 26, 2010); (Exh. 8, K. Mangin Affidavit).

105.    Clear All History is a program that Caremark does not support, and it is not included on Caremark's computers issued to employees.

106.    The forensic analysis of Saban's Caremark-issued laptop computer further revealed that at or about the same time that he downloaded, installed and ran the programs Clear

All History and Delete Files Permanently on April 15, 2010, his last day in the office as a Caremark employee, Saban inserted a portable data storage device into the computer's USB drive. (Exh. 8, K. Mangin Affidavit).

107.    Because Saban ran the Clear All History and Delete Files, Caremark cannot readily determine which files Saban loaded onto the portable data storage device. Nonetheless, Caremark continues to work with a with a forensic computer analyst to determine which files Saban deleted, which files Saban loaded onto a portable data storage device, and which files can be restored. To date, this investigation into the extent of destruction and attempts to restore destroyed data has cost over $5,000. *Id.*

108.    Prior to downloading and running the "Clear All History" and "Delete Files Permanently" programs, Saban sent various Company documents to a personal email account, jsaban@mail.com, that he does not appear to have regularly used. *Id.*

109.    Throughout March of 2010, Saban sent spreadsheets with highly confidential and proprietary information to his personal mail.com email account. Among the types of spreadsheets he forwarded to his personal account were documents regarding Caremark's corporate strategies, forecasted financial performance, budget analyses, financial statements, operating income, 2010 rebate negotiated improvements, and rebate analyses. These documents included specific rebate information for new Caremark negotiations for the 2010 year, Caremark's PBM profit and loss statement including a full financial forecast for the 2010 year, budget documents containing specific items Caremark will use to achieve its financial goals in 2010.

110.    After Saban resigned from Caremark, Caremark changed Saban's password to his Caremark-issued Blackberry mobile device, but it did not revoke his access to the device. Therefore, after he resigned from Caremark, although Saban had possession of the Blackberry

device, he did not have access to Caremark's systems, networks, applications or mailboxes via his Caremark-issued Blackberry.

111.    After Saban returned to Illinois from his trip to Rhode Island, he returned the Blackberry to Caremark by sending it via FedEx from the FedEx Kinko's location in Lincolnshire, Illinois.

112.    When Caremark received Saban's Blackberry on April 21, 2010, the Blackberry's data had been wiped.

113.    Caremark did not issue a remote command to wipe Saban's Caremark-issued Blackberry.

**SXC's History of Attempting to Hire Caremark Employees Subject to Non-Competition and Non-Disclosure Agreements**

114.    This is not the first time SXC has attempted to hire high-ranking Caremark employees with binding non-competition, non-solicitation, and non-disclosure agreements. In 2007, Caremark and SXC engaged in considerable litigation related to SXC's attempts to employ Caremark employees notwithstanding their restrictive covenants. Among the relevant litigation that ensued was: *Caremark Rx, LLC v. Systems Xcellence Corporation, SXC Health Solutions, Inc., Mark Ciamarra, and Sandra Wallace*, No. 07 CH 1266 (19th Judicial Dist. Lake County, Ill.); *Caremark Rx, LLC v. Systems Xcellence Corporation, SXC Health Solutions, Inc., and Russell Annunziata*, No. 07 C 2920 (N.D. Ill.); *Caremark Rx, LLC v. Systems Xcellence Corporation, SXC Health Solutions, Inc., and Jerry Shipkin*, No. 07 C 3420 (N.D. Ill.). In all three cases, Caremark alleged that the employees had breached their employment contracts and violated the Illinois Trade Secrets Act and that SXC had tortiously interfered with Caremark's contracts. On or about May 10, 2007, Caremark obtained an Order granting a Temporary Restraining Order against SXC, Mark Ciamarra, and Sandra Wallace from the Circuit Court for

the 19th Judicial Circuit in Lake County, Illinois. On or about May 25, 2007, Caremark obtained an Order granting a Temporary Restraining Order against SXC and Russell Annunziata from the United States District Court for the Northern District of Illinois.

115. As part of its raid on Caremark's employees in 2007, SXC unsuccessfully attempted to lure Saban away from his Caremark employment.

116. In an effort to resolve the litigation between the two companies in 2007, Caremark and SXC entered into a settlement agreement. As part of that settlement agreement, SXC Health Solutions, Inc.'s CEO Mark Thierer agreed to make declarations under penalty of perjury on a quarterly basis that "neither Russell Annunziata nor any other former Caremark employee has provided me, or to my knowledge, any other SXC employee, with any electronic or other information of Caremark." Thierer's last certification was made March 31, 2010 and is attached hereto as Exhibit 7.

## COUNT I

### (Breach of Contract – Non-Competition Covenant)

117. Caremark realleges and restates paragraphs 1-116 as if fully restated herein.

118. Saban's Non-Competition Agreement is a valid and enforceable contract.

119. The restrictive covenants in Saban's Non-Competition Agreements are reasonably necessary to protect Caremark's legitimate protectible business interests, and are reasonable in terms of scope and duration.

120. Caremark has fully performed all of its obligations to Saban under the Non-Competition Agreements.

121. Saban has breached the Non-Competition Agreements by, *inter alia*, accepting employment at SXC, a direct competitor of Caremark.

122.     Saban's activities on behalf of SXC will require him to use, base judgments upon, and/or disclose Caremark's trade secrets and confidential information.

123.     Saban's activities on behalf of SXC jeopardize substantial and valuable goodwill that Caremark has developed with pharmaceutical companies as well as clients and provides Saban and SXC with an unfair competitive advantage.

124.     Caremark will suffer irreparable harm and has no adequate remedy at law unless Saban's activities are enjoined by the Court.

## COUNT II

### (Breach of Contract – Non-Disclosure Covenant)

125.     Caremark realleges and restates paragraphs 1-124 as if fully restated herein.

126.     Saban's Non-Disclosure Covenant is a valid and enforceable contract.

127.     The restrictive covenants in Saban's Non-Disclosure Agreement are reasonably necessary to protect Caremark's legitimate protectable business interests, and are reasonable in terms of scope and duration.

128.     Caremark has fully performed all of its obligations to Saban under the Non-Disclosure Covenant.

129.     Saban has breached the Non-Disclosure Agreement by, *inter alia*, accepting employment at SXC, a direct competitor of Caremark, in a position that will require him to use, base judgments upon, and/or disclose Caremark's confidential and proprietary information and trade secrets.

130.     Saban's activities on behalf of SXC jeopardize substantial and valuable goodwill that Caremark has developed with pharmaceutical companies as well as clients and provides Saban and SXC with an unfair competitive advantage.

131.    Caremark will suffer irreparable harm and has no adequate remedy at law unless Saban's activities are enjoined by the Court.

## COUNT III

## (Violation of Illinois Uniform Trade Secrets Act)

132.    Caremark realleges and restates paragraphs 1-131 as if fully restated herein.

133.    As set forth above, Saban was given access to and is in the possession of certain confidential and proprietary information constituting "trade secrets" as defined by the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq*., such as Caremark's pricing formulae and structures, negotiating strategies, rebate agreements with pharmaceutical companies, client profitability models, pharmaceutical products acquisition costs, client benefits needs, business development strategies, marketing and sales programs, current and prospective client lists, client profit and loss structures and spreadsheets, and business forecasting and budgeting models.

134.    This information is sufficiently secret to derive economic value from not being generally known to other persons or entities who can obtain economic value from its disclosure or use.

135.    This information is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

136.    Saban has misappropriated Caremark's confidential and proprietary information and trade secrets, including by sending them to his personal email account.

137.    Upon information or belief, Saban has used or will imminently use and/or disclose Caremark's confidential and proprietary information and trade secrets to SXC for use in its business.

138.    Additionally, it is inevitable that Saban will use or rely on the information that he obtained while working for Caremark in connection with his position at SXC and, upon

information and belief, Saban and SXC have used, disclosed or threatened to use or disclose Caremark's confidential, proprietary, and trade secret information with full knowledge that this information was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. Thus, Saban and SXC have unlawfully misappropriated Caremark's trade secret information.

139. Saban and SXC's unauthorized use or disclosure of Caremark's trade secret information, actual or threatened, violates the Illinois Uniform Trade Secrets Act, 765 ILCS 1065/1, *et seq*.

140. Saban's inevitable use of Caremark's trade secrets would give SXC a substantial unfair competitive advantage over Caremark.

141. As a result of the foregoing, Caremark has suffered and will continue to suffer irreparable harm.

142. Caremark has been damaged and will continue to be damaged by the misappropriations and use of its trade secrets by Saban.

## COUNT V

### (Breach of Fiduciary Duty)

143. Caremark realleges and restates paragraphs 1-142 as if fully restated herein.

144. Saban, as an executive of Caremark, owed fiduciary duties to Caremark. These fiduciary duties included the obligation not to disclose Caremark's confidential information to Caremark's competitors or otherwise to assist Caremark's competitors.

145. Saban breached his fiduciary duties to Caremark by, *inter alia,* forwarding Caremark's confidential information from his Caremark email account to personal email accounts which, upon information and belief, he gave or will give to SXC or has used or will use in his new employment with SXC.

146. By reason of the foregoing, Saban has directly and proximately caused injury to Caremark, and Caremark has suffered, and continues to suffer, substantial injury as a result of Saban's actions.

## COUNT VI

### (Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g))

147. Caremark realleges and restates paragraphs 1-146 as if fully restated herein.

148. The computer and Blackberry that Caremark issued to Saban are "protected computers" because they are used in or affecting interstate commerce.

149. Saban did not have authorization to download, install, or run the programs "Delete Files Permanently" and "Clear All History" on his Caremark-issued computer or to transmit a command to erase the data on his Caremark-issued Blackberry.

150. When he downloaded, installed, and ran the programs "Delete Files Permanently" and "Clear All History" on his computer, and when he transmitted a command to erase the data on his Blackberry, Saban knowingly caused the transmission of a program, information, code, or command, and as a result, intentionally caused damage without authorization to Caremark's protected computer.

151. When he downloaded, installed, and ran the programs "Delete Files Permanently" and "Clear All History" on his computer, and when he transmitted a command to erase the data on his Blackberry, Saban intentionally accessed a protected computer without authorization, and as a result, recklessly caused Caremark to incur damage and loss.

152. Specifically, Saban caused Caremark to incur damage because he impaired the integrity and/or the availability of Caremark's data and/or information by downloading, installing and running the programs "Delete Files Permanently" and "Clear All History" on his computer and by transmitting a command to erase the data on the Blackberry. Running those

programs and transmitting that command caused the deletion of electronic files stored on Caremark's protected computers.

153.    Additionally, Saban caused Caremark to incur loss because as a result of the damage he caused to Caremark's protected computers, Caremark has incurred costs in excess of $5,000 in responding to the offense and in hiring an expert consultant to conduct a damage assessment and attempt to restore the data and/or information deleted when Saban downloaded, installed and ran the programs "Delete Files Permanently" and "Clear All History" on his computer and transmitted a command to erase the data on his Blackberry.

## COUNT VII

### (For Preliminary and Permanent Injunctive Relief)

154.    Caremark realleges and restates paragraphs 1-153 as if fully restated herein.

155.    Caremark has suffered and will continue to suffer irreparable injury as a result of Saban's continuing contract violations and Saban's unlawful misappropriation of Caremark's confidential information and trade secrets.

156.    Caremark has been and will continue to be injured, irreparably and otherwise in amounts that will be difficult to determine or calculate, as a result of Saban's conduct.  Caremark has lost or will lose valuable clients, business opportunities, employees, sales, confidential information and trade secrets as a result of Saban's conduct.  The monetary value of these sales and profits lost or likely to be lost by Caremark as a result of Saban's actions will be difficult to determine.  Likewise, the value of lost or eroded confidential information will be difficult or impossible to calculate.

157.    Caremark is likely to prevail on the merits because Saban is in open breach of his Non-Competition Agreement and Non-Disclosure Agreement.  In addition, Caremark is likely to prevail on the merits because Saban has no choice but to use, rely on or base judgments on

Caremark's confidential information and trade secrets while in the employ of SXC, a direct competitor of Caremark.

158.     Injunctive relief is necessary as no adequate remedy at law exists.  Unless an injunction is issued, Caremark will continue to suffer irreparable and incalculable harm, including disclosure of highly valuable confidential information and trade secrets, resulting in loss of clients, vendors, employees and sales, for which it can never be compensated.

## PRAYER FOR RELIEF

Wherefore, Caremark requests that judgment be granted in its favor and against Saban, and that Caremark be granted:

(a)     A preliminary and permanent injunction against Saban and anyone acting in concert with him, prohibiting said individuals and/or entities from using or disclosing Caremark's confidential proprietary and/or trade secret information;

(b)     An order mandating that Saban immediately return any and all copies, reproductions, summaries or notes made from any item of confidential information or trade secret that came into his possession by reason of his employment at Caremark.

(c)     An order prohibiting Saban until at least May 4, 2011 from engaging, directly or indirectly in:

> Competition with the Company. "Competition" shall mean engaging in any activity for a Competitor of the Company, whether as a principal, agent, partner, officer, director, employee, independent contractor, investor, consultant or stockholder (except as a less-than one percent shareholder of a publicly traded company) or otherwise. A "Competitor" shall mean any person, corporation or other entity (and its parents, subsidiaries, affiliates and assigns) doing business in any geographical area in which the Company or any of its subsidiaries or affiliates are doing or have imminent plans to do business, and which is engaged in the operation of: (a) a retail business which includes or has imminent plans to include a pharmacy *(i.e.* the sale of prescription drugs) as an offering or component of its business, including but not limited to, chain drug store companies such as Walgreen Co. and Rite Aid Company, mass merchants such as Wal-Mart Stores, Inc. and Target Corp.,  and food/drug combinations such as The Kroger Co. and

Supervalu Inc.; and/or (b) a business which includes or has imminent plans to include mail order prescription, specialty pharmacy and/or pharmacy benefits management or any other services offered by Caremark Rx, LLC as an offering or component of its business, such as Medco Health Solutions, Inc. or Express Scripts, Inc., and/or (c) a business which includes or has imminent plans to include offering, marketing or the sale of basic acute health care services at retail or other business locations, similar to the services provided by MinuteClinic, LLC (and excluding hospitals, private physicians' offices or other businesses dedicated to the direct provision of health care services). During the Non-Competition Period, Saban will not, directly or indirectly, engage in any activity that involves providing audit review or other consulting or advisory services with respect to any relationship between the Company and any third party.

And further prohibiting Saban from:

at any time, revealing to any person or entity any of the trade secrets or Confidential Information concerning the organization, business, or finances of the Company or of any third party which the Company is under an obligation to keep confidential, except as may be required in the ordinary course of performing Saban's duties as an employee of the Company. The Company's Confidential Information includes but is not limited to non-public information such as computer code generated or developed by the Company; software or programs and related documentation; strategic compilations and analysis; strategic processes; business or financial methods, practices and plans; non-public pricing; operating margins; marketing, merchandising and selling techniques and information; customer lists; details of customer agreements; pricing arrangements with drug manufacturers; pharmacy reimbursement rates; expansion strategies; real estate strategies; operating strategies; sources of supply; employee compensation and benefit plans, and patient records (collectively, "Confidential Information"). Saban shall keep secret all such matters entrusted to him/her and Saban shall not use or attempt to use any Confidential Information on behalf of any person or entity other than the Company, or in any manner which may injure or cause loss or may be calculated to injure or cause loss, whether directly or indirectly, to the Company.

Saban also shall not use or permit to be used any such notes, memoranda, reports, lists, records, drawings, sketches, specifications, software programs, data, documentation or other materials.

(d)     An order prohibiting Saban until at least May 4, 2012 from directly or

indirectly:

soliciting, accepting, or attempting to solicit or accept business from any customer, prospective customer, consultant, joint venture partner, independent contractor, or supplier of Caremark for the purposes of offering, selling or

providing products or services that, directly or indirectly, compete or interfere with the business of Caremark or (ii) hiring, soliciting, or inducing any employee of Caremark to leave the employ of Caremark or to reduce the services that he or she provides to Caremark.

       (e)      compensatory and punitive damages;

       (f)      attorneys' fees and costs; and

       (g)      such other and further relief as may be appropriate.

Date: May 5, 2010                           Respectfully submitted,

                                        CAREMARK Rx, L.L.C., CVS PHARMACY, INC., and CAREMARK, L.L.C.

                                        By: /s/ Peter J. Kocoras
                                        One of Defendants/
                                        Counterclaim Plaintiffs' Attorneys

Howard M. Pearl
Rex L. Sessions
Peter J. Kocoras
Kevin M. Cloutier
hpearl@winston.com
rsessions@winston.com
pkocoras@winston.com
kcloutier@winston.com
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois
(312) 558-5600 (telephone)
(312) 558-5700 (facsimile)

## CERTIFICATE OF SERVICE

The undersigned attorney states that on the 5th day of May, 2010, he caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which may be accessed by counsel for Plaintiff/Counterclaim Defendant Joel Saban.

Nicholas Anaclerio
Brian V. Alcala
Kamau A. Coar
Jill C. Taylor
Ungaretti & Harris LLP
3500 Three First National Plaza
Chicago, IL 60602
Fax: (312) 977-4405

By: ___/s/ Peter J. Kocoras_____
One of Defendants/Counterclaim Plaintiffs' Attorneys

## **VERIFICATION**

Under penalties as provided by law, the undersigned, Jon Roberts, Executive Vice President, Rx Purchasing, Pricing and Network Relations, being first duly sworn under oath, deposes and states that he has read the foregoing Verified Complaint for Injunctive and Other Relief, and on the basis of his personal knowledge, review of appropriate business records and discussions with relevant knowledgeable personnel, he believes the allegations contained therein, particularly paragraphs 9-28; 32-57; 62-65; 68-73; 84-86; 88; 91-92; 94-96; 110 are true and correct except as to matters therein stated to be on information and belief, and as to such matters, the undersigned certifies as aforesaid that he believes same to be true to the best of his knowledge, information and belief. This verification is made by deponent and not by Plaintiff because Plaintiff is a limited liability company and deponent is a duly authorized representative thereof.

Jon Roberts

Sworn to and subscribed before me this _5_ day of May, 2010.

Notary Public

My Commission Expires: _02/27/14_

## **VERIFICATION**

Under penalties as provided by law, the undersigned, Erin Kirchhardt, Director, Human Resources Business Partnering, state that I have read the foregoing Verified Complaint for Injunctive and Other Relief, and on the basis of my personal knowledge, review of appropriate business records and discussions with relevant knowledgeable personnel, believe the allegations contained in paragraphs 8, 66-67, 74-77, 81-83, and 87 are true and correct except as to matters therein stated to be on information and belief, and as to such matters, I certify that I believe same to be true to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct. This verification is made by deponent and not by Plaintiff because Plaintiff is a limited liability company and deponent is a duly authorized representative thereof.

Erin Kirchhardt

Sworn to and subscribed before me this 4th day of May, 2010.

Notary Public

My Commission Expires: 2/26/12

RENEE CADLE
Notary Public - Arizona
Maricopa County
My Comm. Expires Feb 26, 2012

CHI:2396087.1

## **VERIFICATION**

Under penalties as provided by law, the undersigned, Diane Nobles, Sr. Vice President Compliance & Integrity and Chief Compliance Officer for CVS Caremark, state that I have read the foregoing Verified Complaint for Injunctive and Other Relief, and on the basis of my personal knowledge, review of appropriate business records and discussions with relevant knowledgeable personnel, believe the allegations contained in paragraphs 29-31 and 58-61 are true and correct except as to matters therein stated to be on information and belief, and as to such matters, I certify that I believe same to be true to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct. This verification is made by deponent and not by Plaintiff because Plaintiff is a limited liability company and deponent is a duly authorized representative thereof.

```
OFFICIAL SEAL
NANCY R BERRY
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:10/01/12
```

_____
Diane Nobles

Sworn to and subscribed before me this _4_ day of May, 2010.

_____
Notary Public

My Commission Expires: _10-01-12_

CHI:2396083.1

## **VERIFICATION**

Under penalties as provided by law, the undersigned, Leland (Lee) C. Giannini, Advisor, Information Security Risk Management for CVS Caremark, state that I have read the foregoing Verified Complaint for Injunctive and Other Relief, and on the basis of my personal knowledge, review of appropriate business records and discussions with relevant knowledgeable personnel, believe the allegations contained in paragraphs 100 and 105 are true and correct except as to matters therein stated to be on information and belief, and as to such matters, I certify that I believe same to be true to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct. This verification is made by deponent and not by Plaintiff because Plaintiff is a limited liability company and deponent is a duly authorized representative thereof.

_____
Leland (Lee) C. Giannini

Sworn to and subscribed before me this 14th day of May, 2010.

_____
Notary Public

My Commission Expires: 08/23/2012

CHI:2396731.1