**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHER DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOEL SABAN,** | ) | |
| | ) | |
| **Plaintiff/Counter-Defendant,** | ) | |
| | ) | **Case No. 10 C 2428** |
| **v.** | ) | |
| | ) | **Magistrate Judge Morton Denlow** |
| **CAREMARK Rx, L.L.C.,** | ) | |
| **a Delaware Limited Liability** | ) | |
| **Company, CVS PHARMACY, INC.,** | ) | |
| **a Rhode Island Corporation, and** | ) | |
| **CAREMARK, L.L.C., a California** | ) | |
| **Limited Liability Company,** | ) | |
| | ) | |
| **Defendants/Counter-Plaintiffs.** | ) | |

**TO:  THE HONORABLE REBECCA R. PALLMEYER**
**UNITED STATES DISTRICT JUDGE**

## REPORT AND RECOMMENDATION

This matter comes before the Court for the purpose of conducting an evidentiary hearing and making a report and recommendation in connection with Defendants/Counter-Plaintiffs' Caremark Rx, L.L.C., CVS Pharmacy, Inc., and Caremark, L.L.C. (collectively "Defendants" or "CVS Caremark") motion for preliminary injunction to enjoin Plaintiff/Counter-Defendant Joel Saban ("Plaintiff" or "Saban") from continuing his employment with SXC Health Solutions, Inc. ("SXC") by reason of the twelve-month non-compete covenant in Saban's employment agreement with Caremark. Caremark also asks that Saban be enjoined from using or disclosing any of Caremark's confidential information or trade secrets.

The Court held a three day bench trial from June 1 through June 3, 2010.  At the hearing, the parties offered witness testimony and introduced exhibits into evidence.  The Court has carefully considered the testimony of the five witnesses who testified in person, the deposition excerpts of the witnesses included in the parties' exhibits, the parties' trial exhibits, the parties' proposed findings of fact and conclusions of law and the closing arguments of counsel.

The following constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.  To the extent certain findings may be deemed conclusions of law, they shall also be considered conclusions.  Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall also be considered findings.

## I. ISSUES PRESENTED

The following represent the key issues to be decided in this case:

1.      Whether Caremark is likely to succeed on its claim that the non-competition provision in its employment agreement with Saban is enforceable under Rhode Island law.

ANSWER:   No.

2.      Whether Caremark is likely to succeed on its claim that Saban violated the Illinois Trade Secrets Act or the other claims raised.

ANSWER: No.

3.      Whether Caremark will likely suffer irreparable harm in the absence of a preliminary injunction enjoining Saban from working as an Executive Vice President,

2

Pharmacy Operations at SXC.

ANSWER: No.

    4.    Whether Caremark has an adequate remedy at law.

ANSWER: Yes.

    5.    Whether the balance of harms to both sides weighs in favor of entering a preliminary injunction.

ANSWER: No.

## II. FINDINGS OF FACT

**A.    The Parties.**

    1.    Defendant/Counter-Plaintiff Caremark, Rx, L.L.C., is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Nashville, Tennessee.  In March 2007, Caremark Rx, L.L.C., was merged into a subsidiary of CVS Corporation, and CVS Corporation was renamed CVS Caremark Corporation. CVS Pharmacy, Inc., is a Rhode Island Corporation with its principal place of business in Rhode Island.  Defendant/Counter-Plaintiff Caremark L.L.C., is a California limited liability company with its principal place of business in Tennessee. (Dkt. 36 at ¶ 2)[1]. Per Lofberg ("Lofberg"), President of Caremark, Jonathan C. Roberts ("Roberts"), Caremark's Executive Vice President of RX Purchasing, Networks and Underwriting, and

---

[1]References to "T. __" are to the June 1 through June 3, 2010 trial transcript.  References to "PX __" and "DX __" are to Plaintiff's and Defendants' trial exhibits, respectively.  Reference to "Dkt. __" are to docket entries.  The Court has provided selected citations to the factual record, but these are intended to be representative citations and there may be other factual support in the record that is not specifically cited.

Christian Luthin ("Luthin"), Caremark's Executive Vice-President Operations, testified at trial. Diane Nobles, Sr. Vice President Compliance & Integrity and Chief Compliance Officer for CVS Caremark, testified by means of deposition. (DX 79.)

2.     CVS Caremark is composed of two principal types of business: one part deals with running its national chain of 7,000 retail drugstores, and the other part provides pharmacy benefits management ("PBM") services. (T.36, 88.)    For clarity, the retail side of CVS Caremark is herein referred to as "CVS," and the PBM side is referred to as "Caremark."   This litigation involves the PBM side of the business. Caremark's PBM manages prescription drug benefits to over 2,000 health plan sponsors and their millions of plan participants throughout the United States, such as health insurance companies, self-insured employers, managed care organizations, government agencies, and labor unions. (T. 39-40; Dkt. 36 at ¶ 9).

3.     Plaintiff/Counter-Defendant Joel Saban ("Saban") is a citizen of Illinois residing in Buffalo Grove, Illinois.  Saban worked for Caremark's PBM from 1997 through April 20, 2010.  (T. 374, 388.)  Saban's career at Caremark began in 1997 as an analyst in the Finance Department, and he was promoted to Senior Vice President of Industry Relations in 2006.  (T. 374-75.)  Saban held that position until he resigned from Caremark on April 20, 2010.  (T. 375, 388.)  On May 3, 2010, Saban began working at SXC in the position of Executive Vice President, Pharmacy Operations.  (DX 9, T. 297, 392.)  Saban worked for three days at SXC, but has not returned to work since that time, pending the outcome of this litigation.  (T. 393-94.)  Saban testified at the hearing.

4

4.    SXC, though not a named party to the case, is Saban's prospective employer, with its principal place of business in Lisle, Illinois.  SXC consists primarily of two types of business: one that provides healthcare information technology to PBMs through licensing of pharmacy benefits claims processing software and hardware ("HCIT"), and the other that provides PBM services to insurers, self-insured employers, union groups, governmental entities, and other plan sponsors.  (*Id.*, T. 279; DX 50.)  Mark Thierer ("Thierer"), SXC's President and CEO, testified at the hearing.

**B.    The Pharmacy Benefits Management Business.**

5.    PBMs serve the function of managing prescription drug coverage for health plans, government agencies, and employees.  (DX 37 at I; Dx 42 at 5; T. 39.)  PBMs typically provide this service by developing lists of preferred drug products (the "formulary") for plan members, providing access to networks of retail pharmacies, and providing prescriptions through mail order service.  (DX 37 at i, iv; T. 40)  PBMs also negotiate volume rebates and discounts from manufacturers of brand-name and generic drugs, and they negotiate with their networks of retail pharmacies to set reimbursement rates for generic drugs.  (DX 37 at 1; T.40, 121-22.) The PBM business is competitive, and the terms of negotiated rebate agreements (rebates to be paid to the PBM by the drug manufacturer) and reimbursement rates paid by the PBM to retail pharmacies are generally considered confidential information.  (Dkt. 36 at ¶ 11; T. 42, 45,132, 188, 323.)  The primary factors determining the discounts received from the drug manufacturers are the volume of business the PBM can provide and the PBM's effort to promote the use of their drug. (T. 115-16.)

6.    Caremark uses a business model that divides its PBM unit into three primary areas of responsibility: sales, trade, and operations. (T. 124-25, 375.) The sales component is primarily responsible for finding and selling to new health plan clients, maintaining and supporting relationships with existing clients, and selling additional programs to existing clients. The trade component is responsible for purchasing brand-name and generic drugs, negotiating rebates from pharmaceutical manufacturers, setting reimbursement rates for generic drugs, and contracting with retail pharmacies where patients can fill their prescriptions. The operations component has responsibility for processing and dispensing orders for prescription drugs through in-person pickup at a retail pharmacy (such as CVS) or through the mail. (T. 124-25, 375.) At Caremark, each of these areas are headed up by an Executive Vice-President. Saban worked in the trade area and he and three other Senior Vice-Presidents reported to Executive Vice-President Jon Roberts. (Def. Demo. Ex. 1.) Saban was responsible for negotiating discounts and rebates with the branded pharmaceutical companies and negotiating return policies for returned or out of date products. (T. 131.)

7.    Some PBMs, including Caremark and SXC, have mail-order drug programs for brand-name, generic, and specialty[2] drugs. (DX 42 at 5-6; T. 149, 280, 290.) Patients send their prescriptions to the mail-order pharmacy facility, the pharmacists at the facility check and fill the prescriptions, and then the drugs are mailed to the patients' homes. (T. 223.)

---

[2]"Specialty" drugs are a separate category of pharmaceuticals that are rare, costly, or complicated and that require special handling or that patients must be taught to self-administer. (T. 131-32.)

C.    **Caremark and SXC Rarely Compete.**

8.    Although Caremark and SXC both provide PBM services, they rarely compete. Caremark is one of the "Big 3" and SXC is one of the "Little 100." Caremark currently provides services to over 2,000 health plan sponsors and offers health plan participants the choice of obtaining their medications at approximately 60,000 retail pharmacies, which constitute 99% of all retail pharmacies in the United States. (Dkt. 36 at ¶ 10; T. 207.) The 2009 annual revenue of the PBM division of CVS Caremark was approximately $50 billion. (DX 2 at ¶ 27; T. 136, 287.) Caremark's biggest competitors are Medco Health Solutions, Inc. ("Medco") and Express Scripts, Inc. ("Express Scripts"), who together with Caremark make up the "Big 3" in the PBM industry. (T. 90, 281; DX 44.) These companies regularly compete with each other for accounts worth $100,000,000 or more. (T. 90.) The "Big 3" have roughly 65% of the PBM market, whereas there are approximately 100 other PBMs, including SXC, that service the remaining 35% of the PBM market. (T. 280.)

9.      SXC's 2009 annual revenue from its PBM business was approximately $1 billion.  (DX 42 at 12; T. 287.)  SXC's typical accounts fall within the range of $2,000,000 to $6,000,000.  (T. 281.)  SXC currently has only two accounts, out of 500 clients, worth $100,000,000 or more. (T. 281, 288.)  In 2009, the following PBM comparisons can be made between Caremark and SXC:

|  | **Caremark** | **SXC** |
|---|---|---|
| PBM Revenue | $ 50 billion | $ 1 billion |
| Mail Order | $ 6 billion | $ 40 million |
| Specialty | $ 4 billion | $ 100 million |
| $100 million accounts | Numerous | 2 |

10.      The rebate terms a PBM is able to negotiate with pharmaceutical manufacturers are a critical part of its ability to generate revenue.  (Dkt. 36 at ¶ 15, T. 51, 60, 132.)  Due to its size, Caremark is able to negotiate directly with pharmaceutical manufacturers for rebate contracts, the rates of which generally grow more favorable as the drug volume increases.  (DX 2 at ¶ 27; T. 291-92, 387.)  Without having Caremark's size, volume, market dominance, and buying power, SXC cannot and does not negotiate contract terms directly with drug manufacturers. (T. 142, 282-91, 387, 445.)  Rather, SXC utilizes a third-party company called an aggregator to negotiate rebate contracts, which combines the volumes purchased by a number of smaller PBMs in an effort to increase the companies' respective purchasing power.  (T. 291, 387.)

11.      SXC largely avoids competing with the "Big 3," including Caremark, on large

8

accounts. (T. 284-87.) Due to their disparity in size, Caremark and SXC have competed as finalists for less than ten of the same clients over the past five years. (Dkt. 36 at ¶ 91, T. 283-87.) As explained by SXC's President, "As a general rule, if it's a large account and it's a large mail order operation, we no-bid. And that's been our standing policy since I joined the company." (T. 287.)

12. New customers and renewal contracts for existing customers are generally obtained through a Request for Proposals ("RFP") process. The customer generally sets forth its requirements in the RFP and seeks bidders. The RFPs are not confidential. (T. 64.) Contracts are generally for a 1-3 year period and consist of 30-40 pages of negotiated terms. The final contract terms are usually confidential. Once a contract is signed, there is little or nothing a competitor can do to disturb that business during the term of the contract. It is uncommon for a health plan to use more than one PBM at one time. (Dkt. 36 at ¶ 27.) Saban and SXC are not in a  position to harm any of Caremark's existing client relationships nor is there any threat that they will do so.

**D.     Saban's Employment Agreement with Caremark.**

13. Caremark executives were regularly required to sign employment agreements which contained an extremely broad form non-compete provision that, if enforced, would preclude Caremark executives from working for one year for any competitor, in any position, anywhere Caremark or CVS do business. (T. 423.) The term "competitor" is broadly defined to include a retail business which includes a pharmacy, a PBM business, or basic acute health services at retail. (DX 7 at ¶ 5(a).) On December 14, 2009, Saban signed an

9

Employment Agreement ("Caremark Employment Agreement") effective from March 22, 2010 until March 21, 2012, which contained the broad one-year non-competition clause and the non-disclosure of confidential information clause that contained no time limit. (DX. 7.)

14.     The non-competition clause provides:

5(a).   Non-Competition. During the Executive's employment and during the Non-Competition Period (defined below), Executive will not, directly or indirectly, engage in Competition with the Company. **"Competition" shall mean engaging in any activity for a Competitor of the Company,** whether as a principal, agent, partner, officer, director, employee, independent contractor, investor, consultant or stockholder (except as a less-than one percent shareholder of a publicly traded company) or otherwise. **A "Competitor" shall mean any person, corporation, or other entity (and its parents, subsidiaries, affiliates and assigns) doing business in any geographical area in which the Company or any of its subsidiaries or affiliates are doing or have imminent plans to do business, and which is engaged in the operation of: (a) a retail business which includes or has imminent plans to include a pharmacy (*i.e.* the sale of prescription drugs) as an offering or component of its business**, including but not limited to, chain drug store companies such as Walgreen Co. and Rite Aid Company, mass merchants such as Wal-Mart Stores, Inc. and Target Corp., and food/drug combinations such at The Kroger Co. and Supervalu Inc.; **and/or (b) a business which includes or has imminent plans to include mail order prescription, specialty pharmacy and/or pharmacy benefits management** or any other services offered by Caremark Rx, LLC as an offering or component of its business, such as Medco Health Solutions, Inc. or Express Scripts, Inc., **and/or (c) a business which includes or has imminent plans to include offering, marketing or the sale of basic acute health care services** at retail or other business locations, similar to the services provided by MinuteClinic, LLC (and excluding hospitals, private physicians' offices or other businesses dedicated to the direct provision of health care services). During Executive's employment by the Company and during the Non-Competition Period, Executive will not, directly or indirectly, engage in any activity that involves providing audit review or other consulting or advisory services with respect to any relationship between the Company and any third party. **The "Non-Competition Period" shall be the 12-month period following the termination of Executive's employment with the company for any reason,** provided that the Company may, in its sole discretion, extend

10

the length of the Non-Competition Period in accordance with Section 4(c)(iv) above.

(DX 7 at ¶ 5(a).) (emphasis added).) This litigation addresses the legality and enforceability of this non-compete provision.

15. The non-disclosure of confidential information provision of the Caremark Employment Agreement provides:

5(c). <u>Non-Disclosure of Confidential Information</u>.

(i) Executive will not at any time, whether during or after the termination of Executive's employment, reveal to any person or entity any of the trade secrets or Confidential Information concerning the organization, business, or finances of the Company or of any third party which the Company is under an obligation to keep confidential, except as may be required in the ordinary course of performing Executive's duties as an employee of the Company. The Company's Confidential Information includes but is not limited to non-public information such as computer code generated or developed by the Company; software or programs and related documentation; strategic compilations and analysis; strategic processes; business or financial methods, practices and plans; non-public pricing; operating margins; marketing, merchandising and selling techniques and information; customer lists; details of customer agreements; pricing arrangements with drug manufacturers; pharmacy reimbursement rates; expansion strategies; real estate strategies; operating strategies; sources of supply; employee compensation and benefit plans, and parties records (collectively, "Confidential Information"). Executive shall keep secret all such matters entrusted to him/her and Executive shall not use or attempt to use any Confidential Information on behalf of any person or entity other than the Company, or in any manner which may injure or cause loss or may be calculated to injure or cause loss, whether directly or indirectly, to the Company.

(ii) Further, during his/her employment, Executive shall not make, use or permit to be used any notes, memoranda, reports, lists, records, drawings, sketches, specifications, software programs, data, documentation or other materials of any nature relating to any matter within the scope of the business of the Company or concerning any of its dealings or affairs otherwise than for the benefit of the Company. Executive shall not, after the termination of his/her employment, use or permit to be used any such notes, memoranda, reports, lists, records, drawings, sketches, specifications, software programs, data, documentation or other materials. All of the foregoing shall be and remain the sole and exclusive property of the Company and, immediately upon the termination of his/her employment, Executive shall deliver all of the foregoing, and all copies thereof, to the Company at its main office.

(*Id.* at ¶ 5(c).) Saban has acknowledged his willingness to abide by the non-disclosure provision.

16.    The Caremark Employment Agreement further provides that these restrictive covenants "survive termination of [Saban's] employment, regardless of the reason for such termination." (*Id.* at ¶ 7(h).) Moreover, the Caremark Employment Agreement contains a severability clause providing that "the unenforceability of any one clause shall in no way impair the enforceability of any of the other clauses herein." (*Id.* at ¶ 7(b).)

17.    In the event of a breach, the Caremark Employment Agreement provides a one-sided fee shifting provision that gives Caremark, "in addition to any and all remedies at law, the right to an injunction, specific performance or other equitable relief to prevent the violation of Executive's obligations hereunder, and without providing a bond to the extent permitted by the applicable rules of civil procedure . . . . In the event that a court issues a temporary restraining order, preliminary injunction, permanent injunction . . . or awards CVS any damages due to Executive's breach of this Agreement, Executive agrees promptly to reimburse the Company for all reasonable attorneys fees incurred by CVS in connection with

12

obtaining such equitable relief or damages."  (*Id.* at ¶ 6.)

18.     Enforcement of the non-compete provision would effectively terminate Saban's chosen career in the PBM industry and put him on the sidelines for one year.  The agreement also seeks to prevent him from working at any position with one of the 100 other PBM companies or at any position with any business that has a retail pharmacy, or provides basic acute health services at retail, even though he never engaged in that side of the business.

**E.     Saban's Employment Duties at Caremark.**

19.     Saban served as Senior Vice President of Industry Relations at Caremark from March 2006 until April 20, 2010.  (DX 2 at ¶ 2; T. 374, 388.)  Saban's direct supervisor from January 1, 2009 through the date of his resignation was Roberts, Executive Vice President of Prescription Purchasing, Network & Underwriting.  (T. 121, 129-30.)  Saban and Roberts were part of the "trade" group of the Caremark PBM.  (T. 125, 175.)  Saban was one of four Senior Vice-Presidents who reported to Roberts. (Dx Demo. Ex 1.)  Saban was responsible for approximately 130 people in his group.  (T. 376.)

20.     At Caremark, Saban was responsible for contracts with pharmaceutical companies relating to brand-name prescription drugs. (Dkt. 36 at ¶ 68, T. 50, 131.)  The primary duties of his position included:

a.     managing and overseeing contract negotiations to purchase branded drugs from pharmaceutical companies, including negotiations related to the rebates Caremark would receive from pharmaceutical companies;

b.     managing the performance of such contracts with the pharmaceutical companies;

     c.     overseeing the financial and profitability analysis of such contracts;

     d.     overseeing the management of the Maximum Allowable Cost ("MAC") pricing lists, a process by which Caremark prices generic drugs either to clients or for the purposes of providing maximum reimbursement rates to retail pharmacies;

     e.     managing the group that analyzed performance of Generic Effective Rate ("GER") guarantees, by which Caremark guarantees its clients a discount rate for generic drugs;

     f.     managing the contracts through which Caremark sold patient data to other companies;

     g.     coordinating the pricing lists of drugs and recommending a list of preferred drugs, or formularies, for the "Therapeutic Interchange Program" ("TIP"), by which Caremark seeks to minimize prescription drug costs by recommending to its clinic services component that certain more profitable drugs be exchanged for similar but less profitable ones; and

     h.     preparing the budget for the trade group.

(Dkt.36 at ¶ 68; DX 2 at ¶ 23; T. 90, 130-32, 137-40, 146-48, 253-58, 376-80).

     21.     Saban had no responsibility for the operations group, which handled the mail order and specialty pharmacy business, and specifically had no involvement in the following tasks:

     a.     distribution or turn-around time of prescription orders;

     b.     ensuring quality of prescription orders;

     c.     managing pharmacy accreditation processes or overseeing state and federal license processes;

     d.     overseeing pharmacy staff; and

     e.     overseeing clinical programs.

(DX 2 at ¶ 23; PX 11 at 2; T. 380-82).   At Caremark these duties were the primary

responsibility of the "operations" group. Luthin, Executive Vice President of Operations, oversaw mail-order operations and Dave Golding ("Golding") oversaw specialty pharmacy operations. (T. 222, 265, 267, 382.) Luthin supervised approximately 9,000 employees who performed mail order customer care, client operations, clinical operations and financial operations functions. (T. 222-23.) Although Luthin interacted with Saban, Saban made no effort to learn the operations side of the business from Luthin. (T 247-48.)

22.    Saban had almost no role in soliciting and bidding on new customers at Caremark in the sales side of its business, other than to approve bid deviations on infrequent occasions. (Dkt. 36 at ¶ 50.).

## F.    Saban's Participation in Caremark Committees.

23.    Saban served on CVS/Caremark's Operating Committee, made up of executives from the retail and PBM sides to review company-wide performance and initiatives. (T. 168-69, 382.) The information provided to the Operating Committee was constantly changing to reflect current operations and issues. (T. 169-70; DX 61, 63, 67.) In addition, Saban interacted with other PBM groups during budget and forecasting meetings, and in other day-to-day operations of the PBM. (T. 226, 229.)

24.    Saban was a member of the Pharmacy Services Leadership Committee through December, 2009. This committee consisted of the PBM leadership. The committee met monthly to review goals and objectives. After Lofberg took over as President in January, 2010, Saban and others were dropped from the committee. (T. 161-64.) Saban has had no involvement with this committee since December, 2009 and the information presented

changes on a monthly basis and becomes stale.

25.     Saban joined Caremark's Executive Underwriting Committee in approximately September, 2009. (T. 168.) The Executive Underwriting Committee met weekly to discuss deals valued at over $100 million. (T. 167.) Items discussed at these meetings included the client's volume, the type of pricing Caremark could offer for mail and retail pharmacies, and the clinical programs Caremark could offer. (*Id.*)

26.     Saban was not a member of the Business Planning Committee, composed of the top executives of CVS Caremark. (T. 128.)

**G.     Saban's Duties at SXC Are Completely Different than His Caremark Duties.**

27.     Saban's position at SXC is Executive Vice President for Pharmacy Operations. (DX 9 at 2.) He will be responsible for running SXC's mail service and specialty pharmacy operations. (DX 2 at ¶ 24; T. 293, T. 394.) This is comparable to the positions currently held by Luthin and Golding at Caremark. (T. 255-56, 381-82; Def. Demo Ex. 1.) Saban's primary duties will include:

    a.     overseeing the day-to-day operations of taking and filling pharmaceutical mail orders;

    b.     lowering the time it takes for orders to be filled;

    c.     lowering the overhead costs of dispensing drugs;

    d.     ensuring the quality of the orders filled;

    e.     managing the outbound distribution of prescriptions to plan participants;

    f.     planning for future drug distribution capacity;

g.      administering and reporting the drug cost containment programs performed in the mail-order pharmacy;

h.      managing the pharmacy accreditation process;

i.      overseeing state and federal licensing processes; and

j.      overseeing pharmacy staff.

(DX 2 at ¶ 24; DX 9 at 2; T. 293.)

28.     Saban will not have responsibilities dealing with MAC pricing, GER guarantees, negotiating rebates with pharmaceutical manufacturers, or SXC's aggregators, nor will he supervise those who do.  (T. 298-99, 395-96.)  Saban's job duties will not involve interacting with SXC's underwriting department, as he will not be responsible for pricing the services offered to clients.  (T. 299-300.)

29.     Due to its size, SXC buys its drugs through a third-party aggregator, which pools together smaller orders to get greater bulk pricing from manufacturers. (T. 290-92.) Saban's job at SXC will not involve contact with SXC's aggregator.  (T. 291, 395.)

30.     Saban's duties at SXC fall into the operations area, and will be entirely different than his Caremark duties in the trade area.  He will not utilize the same kind of information he used at Caremark in carrying out his SXC responsibilities, nor does he need or intend to use any of the confidential information gained from his Caremark committee service to perform his duties at SXC.

31.     Saban signed an employment agreement with SXC on May 3, 2010 ("SXC Employment Agreement").  (DX 9.)  The SXC Employment Agreement expressly prohibits

Saban from disclosing any trade secrets or confidential information from a prior employer to SXC. (DX 9 at ¶ 1.4(b).) All SXC employees are required to sign such an agreement and a breach can result in termination. (T. 367-68.)

32.     Saban reported to work at SXC on May 3, 2010 and worked for three days, during which time he did no substantive work. (T. 392-93.) Saban has not gone to work at SXC past those first three days pending the outcome of this litigation.

**H.     Saban's Access To and Use of Caremark's Confidential Information.**

33.     While employed at Caremark, Saban had access to and utilized the following confidential and/or trade secret information:

a.     terms of rebate agreements with drug manufacturers. (T. 442.) Caremark contracts with approximately 80 brand-name manufacturers. (T. 134.) ;

b.     MAC reimbursement pricing lists. (T. 446.)

c.     GER discount rate guarantees. (T. 451.)

34.     Rebate arrangements, generic pricing, and GER guarantees change regularly, and the terms eventually become stale information. (T. 42-43, 132-34, 245.) MAC lists are revised on a weekly basis. (T. 447.) In the course of a year, Caremark executes hundreds of new or amended contracts with drug manufacturers. (T. 134-35.)

35.     Caremark takes ongoing steps to protect its confidential and trade secret information. (DX 79 at 91-93; DX 8, 83-85.) Caremark has implemented security measures to ensure that its confidential information and trade secrets are not used or disclosed outside of Caremark. (DX 79 at 91-93, DX 84-85.) For example, the original copies of client

contracts containing confidential rebate information are kept in locked file cabinets, and copies of the contracts are maintained on secured internal networks to which only certain employees have access.  (*Id.*) Information stored in Caremark's computer systems is password-protected with access limited to employees on a need-to-know basis. (*Id.*)  Saban does not currently have access to any of this information, except what he can remember.

36.　　Saban was assigned two pieces of equipment by Caremark to use during his employment, a laptop computer ("Caremark computer") and a hand-held Blackberry device ("Blackberry").  (DX 2 at ¶ 3.)

37.　　Between 2007 and 2010, while employed at Caremark, Saban regularly emailed Caremark information to his personal email for the purposes of working on projects from his home computer.  (PX 11 at 4; T. 397.)  From there, he would read or work on them from that computer or print them out and work with them.  (PX 2 at ¶ 19.)  When finished, he disposed of the documents securely by deleting the files from his home computer and/or shredding printed documents.  (*Id.*)  No specific policy prohibited such conduct while Saban was employed at Caremark, and other Caremark employees, including Lofberg, have emailed confidential Caremark information to their personal email addresses for the purpose of conducting work outside the office.  (DX 79 at 51; DX 11 at 4; DX 79 at 11, 51-53; T. 108.)

38.　　On December 28, 2009, Roberts requested Saban to prepare for a January 5, 2010 meeting with Tom Ryan, CVS Caremark's President and CEO, and Per Lofberg, Caremark's new President.  (PX 8.)  On January 3, 2010, Saban plugged the same USB mass storage device into his Caremark computer as well as to his home computer.  (T. 406, 411,

464-65.) At trial, Saban could not specifically remember doing so on January 3, 2010, but it was his practice, when working from home, to transfer files from his work computer to his home computer via a USB drive. (T. 413.) Saban is no longer in possession of the USB storage device used on January 3, 2010. (T. 458.) No specific policy prohibited such conduct while Saban was employed at Caremark. (DX 79 at 56-57.)

39. Saban does not currently have access to any Caremark confidential or trade secret information, other than what is in his head. Saban does not need any Caremark trade secret or confidential information to perform his new job at SXC, and he will be terminated at SXC if he breaches his duty to Caremark not to disclose its confidential and trade secret information. (T. 367, 395-96.)

## I. Firewalls at CVS/Caremark and SXC.

40. The term "firewall" was used frequently during the trial. The term refers to the ability of a company to compartmentalize information when necessary to prevent its disclosure to another part of the business. (T. 100.) Following the merger between Caremark and CVS, the company implemented a firewall policy and training to prevent sharing of confidential information between the PBM and CVS business units. (DX 79 at 26-28, 40; DX11.) The purpose is to prevent the PBM side from accessing the rates that CVS retail pharmacies have with other PBMs, and to prevent the pharmacies from accessing the rates the PBM gives to other pharmacy chains. (*Id.*; DX 10 at 18; T. 123.) The firewall serves to allow each of CVS Caremark's business segments to uphold the integrity of its business relationships with entities that compete with the other Caremark business segments. Success

of the firewall is dependent upon the integrity of the thousands of employees working at Caremark. Saban was an excellent and trusted employee during his thirteen years at Caremark. (T. 130.)

41. The success of the firewall depends in large part upon the integrity of CVS Caremark employees. (DX 79 at 40; T. 100-05.) Employees from the two sides of the business interact daily and have the opportunity to share information. (DX 79 at 36-37; T. 102.) While the two sides may not access each other's confidential computer files, there are no controls in place to prevent violations of the firewall via information exchanged over email. (DX 79 at 40; T. 105.) Despite this possibility, CVS Caremark knows of no violations of the firewall since its inception. (DX 79 at 32-33; T. 101.)

42. Trust and integrity among employees are an important part of the PBM industry in general, where employees often change companies and go to work for competitors. (T. 91-96; 110.) Caremark employs several former Merck-Medco employees, including Lofberg, who explained that trust that former employees will not disclose confidential information from their former employer is an expectation in the industry. (DX 36 at ¶ 31; T. 91-99; 110.) SXC employs several former Caremark employees, and SXC maintains a similar non-disclosure policy to Caremark. (T. 337-38, 367-68.)

43. SXC maintains a firewall between the technology side and PBM side of its business, because its PBM side competes with SXC's PBM clients who rely on SXC for its information technology. (T. 301-04.) SXC intends to implement an effective firewall within its PBM to ensure that Saban does not disclose confidential Caremark information. (T. 354,

359-62.)

**J.      Saban's Move from Caremark to SXC.**

44.      Saban has known Thierer, President and CEO of SXC, since the late 1990s when they both worked at Caremark, and the two kept in touch after Thierer left Caremark in 2003.  (T. 277, 288, 375.)  Saban and Thierer corresponded by email about industry news and to give professional advice or opinions.  (DX 15, 21-22; T. 308, 342-46, 391-92.) Thierer also sent Saban several emails on potential employees SXC was considering interviewing of whom Saban had personal knowledge, and asked for Saban's opinion.  (DX 26-29.)  In December 2009, Saban confirmed to Thierer the identity of Caremark's new President, which was being discussed in the trade.  (DX 15; T. 390-91.)

45.      Despite extensive electronic discovery, there is no evidence that Saban has provided SXC with any proprietary business information related to any of his duties at Caremark.  In particular, there is no evidence that he has shared any pricing information regarding drugs or any trade secret information from his participation in any of the committees in which he participated.

46.      Saban and Thierer began discussing the possibility of Saban leaving Caremark to join SXC in December 2009.  (DX 12-13.)  Saban explained to Thierer that the "opportunity for professional and personal growth is most important to me at this juncture of my career."  (DX 13.)  The two met on December 6, 2009, and Saban thereafter emailed Thierer information about his then-current compensation package at Caremark.  (*Id.*)  Saban emailed Thierer on Monday, January 4, 2010 about further details of his potential

22

employment at SXC.  (DX 16.)  The two continued to correspond from January through March regarding the terms of Saban's potential employment.  (DX 17-18, 20.)   Saban advised Thierer that he could not leave Caremark prior to March 22 because he did not want to jeopardize his three-year retention bonus.  (T. 407.)

47.     Saban wanted to continue his career in the PBM field and was uncertain as to whether he could do so.  Saban sought counsel in February 2010, due to his concern about his Caremark Employment Agreement and its impact on his ability to work at SXC.  (T. 420-22, 455.)  He entered into a joint representation agreement with SXC, by which SXC agreed to pay the legal fees in connection with this litigation to obtain a declaratory judgment regarding the non-compete.  (T. 317-18, 424-25, 455.)

48.     On March 22, 2010, Saban received a substantial bonus pursuant to a three-year executive retention program Caremark had instituted at the time of the CVS and Caremark merger in March 2007.  (T. 439-440.)

49.     April 15, 2010 was the last day Saban reported to his Caremark office.  (T. 397).  On April 14 and 15, 2010, Saban examined the contents of two USB flash drive storage devices utilized during his Caremark employment by plugging them in to his Caremark computer.  (DX 2 at ¶ 4.)  Saban did not delete nor transfer any electronic information from these devices.  (*Id.*)  Saban then left the two devices in the desk drawer of his Caremark office.  (*Id.* at ¶ 6.)

50.     On April 15, 2010, Saban downloaded two programs from the internet to his Caremark computer for the purpose of removing his personal information from the computer,

entitled "Delete Files Permanently" and "ClearAllHistory." He used the second program, "ClearAllHistory," to remove personal information and passwords stored on the Caremark computer. He left the Caremark computer in his office. (DX 2 at ¶¶ 7-10; T. 435-36.)

51.     Saban resigned from Caremark on April 20, 2010 in a meeting with Tom Ryan in Rhode Island. (T. 388-92; DX 2 at ¶ 13.) On the evening of April 20, 2010, pursuant to instructions from Jon Roberts, Saban used FedEx to send his Blackberry to Caremark. (DX 2 at ¶ 18;T. 390.) Before doing so, he restored the Blackberry to its factory settings for the purpose of deleting the information on it. (*Id.*; T. 436-37.) The Blackberry contained duplicate electronic files stored by Caremark in other locations. (*Id.*)

52.     On April 26, 2010, on the advice of counsel, Saban turned over his personal computer to Elijah Technologies, Inc., a computer forensics company, for the purpose of demonstrating he retained no confidential Caremark information. (DX 2 at ¶ 20; T. 397-98.) Saban has not had possession of his personal computer since that time. (T. 398.)

53.     Saban retained no hard or electronic copies of Caremark business information and possesses none to date. (T. 397-98.)

54.     Saban is widely acknowledged to have an excellent memory and the ability to retain some of the pricing and rebate contract information in the Caremark contracts he oversaw. (DX 79 at 87-88; T. 181, 203-04, 225, 273, 442.) The average length of a Caremark rebate contract is 30-40 pages. (T. 386.) At least 3,000 different rebate rates exist for different drugs with Caremark's business, and Caremark contracted for more than 5,000 generic drugs. (DX 2 at ¶¶ 29-30; t. 384-85.) Saban does not remember specific MAC reimbursement rates and GERs Caremark had with its clients. (T. 386-87, 451-52.)

Caremark maintains over 100,000 MAC price points on its various MAC lists, and manages over 6,000 GER guarantees. (DX 2 at ¶¶ 28, 31.)

## K. Caremark's Confidential Information Is Not Threatened by Saban's Employment at SXC.

55. No evidence has been presented that Saban disclosed any of Caremark's confidential information and/or trade secrets to anyone at SXC. (T. 60, 300-01, 388-89; DX 2 at ¶¶ 25-26.) Nor does any evidence establish that Saban is likely to disclose any confidential Caremark information in his employment at SXC. (*Id.*) Caremark's case is predicated on speculation and conjecture, not evidence.

56. Saban is bound by two contracts, the Caremark Employment Agreement and the SXC Employment Agreement, not to disclose confidential and/or trade secret information to SXC that he learned while at Caremark. (DX 7 at 4-5, DX 9 at 2.) Saban has not contested the validity of either of these non-disclosure covenants.

57. Saban took care during his transition from Caremark to SXC to seek out counsel and bring a declaratory judgment action to clarify the reasonableness and scope of the non-competition clause of the Caremark Employment Agreement. Saban voluntarily did not go to work at SXC for two weeks after leaving Caremark as a good faith measure in the hope an agreement could be reached with Caremark. (T. 393.)

58. Saban retains no hard copies or electronic copies of sensitive or confidential Caremark information. (T. 397-98.)

59. The complexity and multiplicity of Caremark's confidential information that

Saban had access to would be nearly impossible for one human being to retain in his head, even one with an extraordinary memory.

60. Information about Caremark's rebate rates, MAC pricing, and GER guarantees would be of no use to SXC even if it were to obtain the information because it does not have the volume to deal directly with drug manufacturers.

61. If it became known that Saban provided confidential Caremark information to SXC, it would harm SXC's reputation within the PBM industry and with its current and potential clients. Therefore, SXC has a strong business interest to protect Caremark's confidential information.

62. Saban has demonstrated personal integrity in his thirteen years of employment at Caremark and in his transition to SXC. He has been placed in an untenable situation in seeking to advance from a Senior Vice President position to an Executive Vice President position within the PBM industry, by reason of the breadth of the covenant not to compete, and he has appropriately sought legal counsel and a declaratory judgment to make sure that he does not run afoul of the law.

**L. Procedural History.**

63. On April 20, 2010, Saban filed an action for Declaratory Judgment seeking to invalidate the non-competition provision in his 2010 Caremark Employment Agreement. Caremark filed counterclaims seeking injunctive relief and damages, asserting: (1) breach of the non-competition covenant; (2) breach of the non-disclosure covenant; (3) violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.*; (4) breach of fiduciary duty; and (5)

violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g).

64.     On May 12, 2010, Judge Rebecca R. Pallmeyer entered a Temporary Restraining Order ("TRO") enjoining Saban from working at SXC for fourteen days. (Dkt. 48.) Judge Pallmeyer has extended the TRO from time to time pending receipt of this report and recommendation. (Dkt. 69, 81.)

### III. CONCLUSIONS OF LAW

**A.      Jurisdiction and Choice of Law.**

The Court has jurisdiction pursuant to 28 U.S.C. § 1331 because Caremark raises a claim under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(g). The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy related to Caremark's CFAA claim. Alternatively, in the absence of federal question jurisdiction, the Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

Rhode Island law governs the enforceability of Saban's Employment Agreement with Caremark due to a choice of law provision in the agreement. *See* DX 7 at ¶ 7(i). Caremark's counterclaims for breach of fiduciary duty and for violation of the Illinois Trade Secret Act are governed by Illinois law. Federal standards govern Caremark's request for a preliminary injunction. *See Vencor, Inc. v. Webb*, 33 F.3d 840, 845 (7th Cir. 1994).

**B.      Standard for a Preliminary Injunction.**

A preliminary injunction is an "extraordinary remedy," and "may only be awarded upon a clear showing that the party seeking it is entitled to such relief." *Winter v. Natural*

*Res. Def. Council, Inc.*, --- U.S. ---,---, 129 S. Ct. 365, 375 (2008). The party moving for a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 374. The Seventh Circuit also considers whether there is an adequate remedy at law. *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). The court then uses a sliding-scale approach to balance the harm the moving party would suffer without the injunction against the harm the non-movant would suffer with it. *Id.* The greater the likelihood of success, the less harm the moving party needs to show, and vice versa. *Id.*

**C.      Caremark Has Not Established a Likelihood of Success on the Merits.**

Caremark has asserted five claims against Saban: (1) breach of the non-competition covenant; (2) breach of the non-disclosure covenant; (3) violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.*; (4) breach of fiduciary duty; and (5) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g). As discussed below, Caremark has not proven it is likely to succeed on the merits with any of these claims. The Court addresses each in turn.

**1.      Caremark is Unlikely to Succeed on its Breach of Contract Claims Because the Non-Competition Covenant is Unreasonable and Unenforceable.**

To succeed on its preliminary injunction motion, Caremark must demonstrate that the restrictive covenant is enforceable under Rhode Island law. As to the non-disclosure

covenant, the parties acknowledge its validity and enforceability, and Saban agrees not to disclose trade secret and confidential information he obtained at Caremark. The contract claim thus boils down to the enforceability of the non-competition covenant.

The Court concludes that the non-competition provision is unreasonable and unenforceable under Rhode Island law. Rhode Island courts do not favor restrictive covenants and subject them to strict judicial scrutiny. *Cranston Print Works Co. v. Pothier,* 848 A.2d 213 (R.I. 2004). Rhode Island will enforce a non-compete "as written only if the contract is reasonable and does not extend beyond what is apparently necessary for the protection of those in whose favor it runs." *Durapin, Inc. v. Am. Products, Inc.,* 559 A.2d 1051, 1053 (R.I. 1989). Thus, a party seeking to enforce a restrictive covenant must show that: (1) the provision is ancillary to an otherwise valid transaction or relationship, (2) adequate consideration supports the provision, and (3) the provision protects a legitimate interest. *Id.* A court then subjects the clause to a test of reasonableness to ensure it is narrowly tailored to protect that interest. *Id.* If the restraint is "somewhat greater than required to protect the legitimate interests of the promisee," the court may partially enforce the restraint to the extent necessary to protect the promisee's legitimate interest so long as the modification does not impose undue hardship on the promisor or adversely affect the public interest. *Id.* at 1058-59. However, the court will not partially enforce a restraint if the circumstances indicate bad faith or deliberate overreaching on the part of the promisee. *Id.* at 1058.

Caremark meets the first three parts of the analysis. The parties do not dispute that

the non-competition covenant is ancillary to an the otherwise valid employment agreement. Consideration is also not at issue in this case. Saban's not inconsiderable salary and Caremark's promise of continued employment suffice as consideration in exchange for his assent to the terms of the contract. *R.J. Carbone Co. v. Regan,* 582 F. Supp. 2d 220, 224 (D.R.I. 2008).

Caremark has a legitimate interest in protecting its confidential information to which Saban had access. *Nestle Food Co. v. Miller,* 836 F. Supp. 69, 74 (D.R.I. 1993). Information is considered confidential when it is not readily ascertainable through ordinary business channels or to a person conducting an independent investigation. *Id.* However, a company's desire to simply free itself from competition from a former employee is not a legitimate interest worthy of protection. *Dryvit Sys., Inc. v. Healy*, 1989 WL 1110572 at *4 (R.I. Super. Apr. 26, 1989).

Caremark has shown a legitimate interest in protecting its confidential drug rebate contract information, retail pharmacy drug reimbursement rates, MAC pricing data, and GER guarantees. Thus, a covenant narrowly tailored to protect these interests, and not merely to prohibit a valuable employee from going to work for another PBM, would be reasonable.

The Court therefore turns to the issue of reasonableness. A restrictive covenant is reasonable only if it does not "extend beyond what is apparently necessary for the protection of those in whose favor it runs." *Durapin,* 559 A.2d at 1053. The Rhode Island Supreme Court has adopted the Restatement (Second) of Contracts to govern this inquiry. *Cranston,* 848 A.2d at 219. Section 188 of the Restatement instructs: "[a] promise to refrain from

30

competition that imposes a restraint . . . is unreasonably in restraint of trade if (a) the restraint is greater than is needed to protect the promisee's legitimate interest, or (b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public." Restatement (Second) of Contracts § 188(1)(a), (b) (1981). A post-employment restraint may impose a hardship on the employee if it "inhibits his personal freedom by preventing him from earning his livelihood if he quits." *Id.* at § 188, cmt. c.

In Rhode Island, courts conducting a reasonableness inquiry look to: 1) whether the provision is narrowly tailored to protect legitimate interests; 2) whether it is reasonably limited in activity, geographic area, and time; 3) whether the promisee's interests are not outweighed by hardship to the promisor; and 4) whether the restriction is likely to injure the public. *R.J. Carbone*, 582 F. Supp. 2d at 225-26.

In this case, the non-competition clause is overly broad in that it precludes Saban from engaging nationwide in *any* activity with any PBM or any company that has a retail pharmacy or provides basic acute healthcare services at retail. Saban's tenure in the PBM industry has lasted more than a decade and he has advanced as an executive in his career. Yet, should Saban decide to join Dominick's as a grocery store manager, he would violate the plain language of the non-competition covenant because their stores house retail pharmacies. Numerous other scenarios can also be created to show the breadth of the non-compete clause.

The non-competition clause thus imposes an unreasonable burden on Saban, which Rhode Island disfavors. In *Aim High Academy, Inc. v. Jessen*, a restrictive covenant that

31

prohibited two gymnastics coaches from joining any competing gyms in any location in Rhode Island was determined to be overly broad in geographical scope. 2008 WL 5325586 at *9 (R.I. Super. Dec. 10, 2008). The court found the covenant prevented the employees "from being employed in their sole field of expertise and experience anywhere in the state," and modified it to competing organizations within a 15 mile radius of the coaches' former gym. *Id.*

Similarly, in *Dryvit Systems, Inc. v. Healy*, the court found a covenant overbroad that prohibited an engineer from working for a competitor for two years within any area his old employer did business. 1989 WL 1110572, at *5. The court reasoned that, "in light of the fact that the plaintiff distributes its products throughout the United States and abroad, the geographic restraint imposed by the restrictive covenant would effectively bar the defendant from accepting employment within the entire industry for a period of two years." *Id.* The court did acknowledge that the engineer had been privy to some confidential information and trade secrets while employed by Dryvit, and so enjoined him from divulging any such information. *Id.* at *6. However, the court also noted that "an employer cannot by contract prevent his employee from using the skill and intelligence acquired or increased and improved through experience or through instruction received in the course of employment." *Id.* at *4; *see also Nestle*, 836 F. Supp. at 76 (prohibiting former salesman from revealing or using confidential information or soliciting his former customers for one year was sufficient to protect employer's interests).

Here, too, the non-competition clause extends far beyond what is necessary to protect

legitimate business interests. Caremark does have a legitimate interest in protecting the use of its rebate and drug reimbursement information from competitors. However, Saban's contract already features a non-disclosure agreement that bars him from releasing Caremark proprietary information to future employers. Unless the evidence suggests Saban disclosed confidential information to SXC or is likely to do so in his role there, enjoining him from going to work there would be unduly burdensome.

Rhode Island courts have enjoined former employees when the employee's knowledge of confidential information is likely to damage the former employer. *See Allen v. Creative Services, Inc.,* 1992 WL 813643, at *2 (R.I. Super. July 6, 1992) (employees' knowledge of training manuals, investigative techniques, confidential sources, and client needs in investigative firm "would be disastrous" to the employer were the employees able to immediately open their own private investigation business); *City Hall Elec. Supply, Inc. v. Rossi,* 1017316, at *2 (R.I. Super. Mar. 2, 1988) (CEO was properly enjoined from competing for three years within the state because he was going to perform "the same work" for a competitor and admittedly possessed tangible confidential information from old employer).

In the present case, however, Caremark has not shown that Saban is likely to disclose Caremark's confidential information beyond mere speculation and conjecture. For one thing, Saban's role at SXC is unlike his role at Caremark, and he will have no use for Caremark's drug rebate contract and pharmacy reimbursement information in his job at SXC. The fact that Caremark and SXC rarely compete and that SXC uses third-party aggregators to

33

negotiate rebate contracts also reduces the usefulness of any knowledge he may retain. Moreover, the evidence does not show that Saban has ever disclosed drug rebate contract information or pharmacy reimbursement rates to anyone at SXC. The evidence also shows that Saban does not possess or have access to hard or electronic copies of Caremark information, but instead left behind his work computers and delivered his personal PC to a third party for a hard drive sweep.

In addition, the usefulness of the confidential information over time, and its tendency to become stale, is also a consideration. *Cranston*, 848 A.2d at 221. Evidence offered at trial establishes that the PBM business is a fast-moving one where information becomes stale quickly. Once a contract is signed, a competitor is not in a position to disturb it. Thus, any information Saban has retained in his head will decline considerably in usefulness as time goes on.

SXC also has a strong business interest in protecting the confidentiality of Caremark's trade secrets. SXC's information technology business is performed for its PBM competitors. If SXC cannot be trusted to safeguard its competitors' confidential information, it would jeopardize millions of dollars of business. SXC requires its employees to sign a non-disclosure clause prohibiting them from disclosing confidential information from former employers, and has fired an employee who allegedly breached that clause.

The culture of personal accountability and trust surrounding the PBM industry also countervails the likelihood of Saban disclosing proprietary information. Saban signed a non-disclosure agreement in his contract with SXC that he would not disclose confidential

34

information from any former employer, on top of the non-disclosure agreement he entered with Caremark. Saban was a trusted and excellent employee at Caremark for thirteen years, and there is no reason to believe he will likely violate his non-disclosure obligations to Caremark and SXC.

The evidence fails to establish a likelihood that Saban will disclose confidential Caremark information while employed at SXC. Meanwhile, Saban is unduly burdened by the broad non-competition clause in his Caremark contract. Thus, the non-competition covenant as written is unreasonable.

Having determined the non-competition covenant is unreasonable, the Court must next determine whether partial enforcement is appropriate to protect Caremark's acknowledged interests. *Durapin,* 559 A.2d at 1058. Under this doctrine, courts partially enforce a restrictive covenant to the extent reasonably necessary to protect the promisee's legitimate interest so long as the modification does not impose undue hardship on the promisor or adversely affect the public interest. *Id.*[3] However, the court will not partially enforce a

---

[3]In adopting this doctrine, Rhode Island rejected the take-it-or-leave-it approach to overly broad restrictive covenants. *Durapin*, 559 A.2d at 1058. Under this regime, if a covenant was unreasonable, the court would invalidate the entire provision. *Id.* Rhode Island initially adopted a "blue-penciling" approach, by which the court, upon finding parts of the covenant unreasonable, would blue pencil, or strike, offending provisions while enforcing reasonable ones. Blue penciling, at least theoretically, required that the contract be divisible or severable. The contract's meaning had to survive after the court exercised unreasonable clauses. *Id.; see Max Garelick, Inc. v. Leonardo* 250 A.2d 354, 357 (R.I. 1969) (holding that "where restrictive covenants contained in an agreement are divisible, the restraints set out therein will be valid to the extent that they are reasonably necessary for the protection of the interest of the person for whose benefit they are intended").

In *Durapin,* the Rhode Island Supreme Court formally adopted partial enforcement as the standard practice of the jurisdiction. *Id.* Partial enforcement encourages the court to jettison unreasonable provisions–and uphold valid ones–regardless of whether the contract is divisible. *Id.; see also Cranston,* 848 A.2d at 221 (referring to partial enforcement by noting that the court has a "free hand to take a 'blue pencil,' if necessary, to draw in any reasonable limitations on such covenants that it concludes are

restraint if the circumstances indicate bad faith or deliberate overreaching on the part of the promisee. *Id.*

In the present case, Caremark's actions in drafting the non-competition clause constitute bad faith and indicate deliberate overreaching. While Rhode Island courts have rarely addressed the issue, the Rhode Island Supreme Court looks to Williston on Contracts and the Restatement (Second) of Contracts to support the good faith requirement. *Durapin*, 559 A.2d at 1058. The need for good faith, as articulated by Williston, is that upholding deliberately unreasonable covenants "tends to encourage employers and purchasers possessing superior bargaining power over that of their employees and vendors to insist upon unreasonable and excessive restrictions, secure in the knowledge that the promise may be upheld in part, if not in full." 4 Williston on Contracts § 13:26 (1981). Moreover, "it is arguable that inserting an unreasonably broad provision itself constitutes a form of bad faith, especially when the covenantee has had the benefit of legal counsel, since it will (presumably) know that, if the clause is held to be unreasonable, it will still get a reasonable restriction." *Id.*

Thus, "a court will not aid a party who has taken advantage of his dominant bargaining power to extract from the other party a promise that is clearly so broad as to

───────────────

overbroad."). Partial enforcement is the practice of the Rhode Island courts today. *See, e.g., Nestle*, 836 F. Supp. at 76 (court partially enforced one-year non-compete, reasoning that a more "practical and fair way" for Nestle to protect its customer base was to enact a one-year restriction prohibiting former salesman from revealing confidential information acquired while at Nestle or soliciting any of his former customers). *Id.*

offend public policy by redrafting the agreement . . . ." Restatement (Second) of Contracts § 184. Courts in partial enforcement jurisdictions have found overly broad and restrictive covenants to be in bad faith when the drafter was "on notice" that overly restrictive covenants were risky. *Laidlaw, Inc. v. Student Transp. of America*, 20 F. Supp. 2d 727, 765 (D.N.J. 1998) (unreasonably broad non-compete covenant directed at suppressing competition by former employees, used against the advice of counsel, was not in good faith); *see also M&F Livestock v. Mohr,* 771 N.W.2d 652, 2009 WL 1491896, at *8 (Iowa Ct. App. May 29, 2009) (court found bad faith and refused to modify a covenant that prohibited a former employee from joining a competing business anywhere in the United States or Canada for one year).

Caremark is a large, sophisticated company taking in billions of dollars of revenue each year, and is clearly in a dominant bargaining position with its employees. It has access to legal counsel through its own in-house department and outside law firms. Caremark chose Rhode Island law to govern the employment agreement with Saban, where courts since at least 1938 have closely scrutinized non-compete covenants to ensure they are reasonable and narrowly-drawn. *See Koppers Products Co. v. Readio*, 197 A. 411, 444-45 (R.I. 1938). The Rhode Island Supreme Court has since then clearly and repeatedly held that such covenants may not simply restrain an employee from competing, but must be narrowly tailored to protect legitimate interests. *See, e.g., Max Garelick, Inc. v. Leonardo* 250 A.2d 354 (R.I. 1969); *Durapin v. Am. Products, Inc.,* 559 A.2d 1051 (R.I. 1989); *Cranston Print Works Co. v. Pothier,* 848 A.2d 213 (R.I. 2004).

37

Given the state of Rhode Island law at the date of Saban's employment agreement in 2009, Caremark and its counsel had to know the non-competition provision was extremely overbroad and an unreasonable restraint on trade. The non-compete provision was drafted in total disregard for the requirement that it not extend beyond Caremark's legitimate business interests. To partially enforce the covenant now will only embolden Caremark to continue using an unreasonably broad covenant, to be tailored by a court only when an employee with the resources to challenge it does so. Caremark's actions in attempting such a broad restraint on employees who try to seek employment elsewhere is so far from the well-settled requirement that any such limitations must be narrowly drawn that it could not have been drafted in good faith or without deliberate overreaching. Therefore, the entire non-competition provision of Saban's Caremark Employment Agreement, ¶ 5(a), is unenforceable as an unreasonable restraint.

Furthermore, the non-disclosure covenant in the Caremark Employment Agreement, ¶ 5(c), prohibits Saban from disclosing Caremark's confidential information to SXC employees, encompassing the legitimate concerns established by Caremark. Since Saban intends to abide by the non-disclosure covenant and the evidence does not establish that he is likely to disclose confidential information, the non-disclosure agreement sufficiently protects Caremark's confidential proprietary information. Therefore, the Court finds the non-competition covenant unnecessary.

Alternatively, even in the absence of Caremark's bad faith and deliberate overreaching, partial enforcement would be appropriate only to prevent Saban from

undertaking duties in the "trade" area at SXC, serving functions similar to those he performed at Caremark. Enjoining Saban from having responsibilities related to negotiating rebate contracts and overseeing MAC pricing would serve to protect Caremark's legitimate interest that its confidential information not be disclosed or utilized at SXC. However, since the evidence has established that Saban will not be performing any such duties at SXC, injunctive relief is unnecessary.

### 2. Caremark is Unlikely to Succeed on its Illinois Trade Secrets Act ("ITSA") Claim.

To establish a violation of the ITSA, 765 ILCS 1065/1 *et seq.*, the plaintiff must prove that information: "was (1) a trade secret; (2) misappropriated; and (3) used in the defendant's business." *Sys. Dev. Servs., Inc. v. Haarmann*, 907 N.E.2d 63, 72 (Ill. App. Ct. 2009). The protection afforded to trade secrets reflects a balancing of social and economic concerns. *Serv. Ctrs. Of Chi., Inc. v. Minogue*, 535 N.E.2d 1132, 1135 (Ill. App. Ct. 1989). On the one hand, an employer who has invested time, money, and effort in developing a secret advantage should be protected from a former employee who improperly discloses the secret. *Id.* On the other hand, courts must recognize the employee's right to make use of general knowledge and skills acquired through experience in pursuing the occupation for which he is best suited. *Id.* It is well established that general skills and knowledge learned in the course of employment do not constitute trade secrets. *ILG Indus.. v. Scott*, 273 N.E.2d 393, 396 (Ill. 1971).

The ITSA defines a "trade secret" as information that "(1) is sufficiently secret to

derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain secrecy or confidentiality." 765 ILCS 1065/2(d). The key factors in determining secrecy are "the ease with which information can be readily duplicated without involving considerable time, effort or expense" and whether the information is publically available. *RKI, Inc., v. Grimes*, 177 F. Supp. 2d 859, 873 (N.D. Ill. 2001).

In this case, Saban was exposed to information at Caremark that constitutes "trade secrets," including the MAC pricing list and structure and the rebate terms with pharmaceutical manufacturers. This information is not ascertainable from public information, and only select Caremark employees are privy to it. Additionally, Caremark derives substantial economic value from its secrecy and takes reasonable steps to safeguard the information.

"Misappropriation" is disclosure or use of a trade secret by one who knows he has a duty not to do so. 765 ILCS 1065/2(b). Actual or threatened misappropriation may be enjoined. 765 ILCS 1065/3(a). In Illinois, the "inevitable disclosure" of a trade secret is enough to show threatened misappropriation under the ITSA. *PepsiCo., Inc. v. Raymond*, 54 F.3d 1262, 1268 (7th Cir. 1995). This requires more than just the employer's fear that the employee will use the trade secrets, but a showing of intent or a high probability the employee will use them. *Id.* at 1268-69.

Inevitable disclosure is not assumed when an employee has general information in his

head as a result of working for a company. *Id.* However, where evidence exists that the employee copied the employer's confidential information, it leads to the conclusion of inevitable disclosure. *RKI, Inc.,* 177 F. Supp. 2d at 876. When evaluating whether the disclosure of trade secrets is inevitable, courts also consider: (1) the level of competition between the former employer and the new employer; (2) whether the employee's position with the new employer is comparable to the position he held with the former employer; and (3) the actions the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer. *Id.*

Here, Saban may have retained some trade secret information by memory. He also likely retains the general knowledge of how Caremark operates that is not a "trade secret." However, no evidence has established that Saban currently has access to or ever gave SXC any of Caremark's trade secret information. Furthermore, Caremark and SXC do not compete to the extent that Saban would inevitably disclose Caremark's trade secret information. Saban's SXC duties will be sufficiently different from those at Caremark, and Saban and SXC have taken measures to ensure Caremark's information remains secret. Thus, nothing indicates it is inevitable that Saban will use Caremark's trade secrets in his new job. Moreover, evidence suggests it would not be to Saban's advantage to divulge confidential information, because doing so would likely adversely affect his job at SXC and SXC's business.

### 3. Caremark is Unlikely to Succeed on Its Breach of Fiduciary Duty Claim.

41

To establish a breach of fiduciary duty, Caremark must prove: "(1) a fiduciary duty exists; (2) the fiduciary duty was breached; and (3) such breach proximately caused the injury of which the plaintiff complains." *Neade v. Portes*, 739 N.E.2d 496, 502-03 (Ill. 2000). As an employee, Saban owed Caremark a duty of loyalty. *See Labor Ready, Inc. v. Williams Staffing, LLC*, 149 F. Supp. 2d 398, 414 (N.D. Ill. 2001). If Caremark can prove Saban was working against Caremark's interests in preparing to move to SXC, it can succeed on this claim. *Automed Technologies., Inc. v. Eller*, 160 F. Supp. 2d 915, 925 (N.D. Ill. 2001).

However, Caremark has not offered sufficient evidence to show a likelihood that Saban breached his duty. Correspondence between Saban and Thierer between January and April 2010 does not show that Saban disclosed sensitive and confidential Caremark information to SXC. Rather, the two emailed about topics widely known within the industry and opinions on individuals SXC was considering hiring, a common practice between industry professionals even at different companies. Nor do the emails show that Saban was otherwise acting against Caremark's interests – instead, he was seeking out possible new employment and negotiating the terms of that employment. Saban turned over his personal computer to a third party in an effort to prove he retained no confidential information from Caremark, and no other evidence has established that he took confidential Caremark material in preparation to turn it over to SXC.

While Saban did enter into a joint representation agreement with SXC in February 2010, while still employed at Caremark, this in itself is not likely to establish a breach of

42

fiduciary duty. The evidence shows that Saban sought counsel in order to clarify his rights and obligations under his Caremark Employment Agreement. Caremark has not shown what injury it suffered as a result of Saban retaining counsel. However, the Court notes that even if this agreement did constitute a breach of fiduciary duty, it does not weigh towards granting an injunction because Caremark would have an adequate remedy at law via a straightforward contract claim.

### 4. Caremark is Unlikely to Succeed on Its Computer Fraud and Abuse Act ("CFAA") Claim.

The CFAA provides for civil liability when one "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage . . . ." 18 U.S.C. § 1030(a)(5)(A) (iii). In order to recover under this provision of the CFAA, the specific "damage" or "loss" must be proven. *Int'l Airport Centers, LLC v. Citrin,* 440 F.3d 418, 419 (7th Cir. 2006). A showing can be made by demonstrating damage to electronic data or money spent in restoring lost material. *Mintel Int'l Group, Ltd. v. Neergheen*, 2010 WL 145786, at *9-10 (N.D. Ill. Jan. 12, 2010); *SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 720-21 (N.D. Ill. 2009). The CFAA authorizes relief when the victim of the violation has incurred "loss . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(I).

Caremark has not offered evidence to establish any likelihood that it can succeed on this claim. Caremark alleged in its counterclaim that Saban's use of the "Delete Files Permanently" and "Clear All History" programs to erase personal files on his Caremark computer, as well as his actions in restoring his Caremark-issued Blackberry to its factory

43

settings, constitute a violation of the CFAA. However, Caremark has not made any showing of damage or loss it suffered due to Saban's actions. No evidence suggests that Saban compromised any of Caremark's electronic data. Moreover, Caremark has not offered proof of funds it expended to fix any alleged damage. Without more, Caremark is highly unlikely to prevail on its CFAA claim. In addition, Caremark would have an adequate remedy at law for monetary damages.

**D.   Caremark Has Not Shown it Will Suffer Irreparable Harm, Lacks an Adequate Legal Remedy, or that the Balance of Harms Favors Injunctive Relief.**

Even though Caremark has failed to establish one of the threshold elements for a preliminary injunction, the court will still examine all of the preliminary injunction considerations. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). Thus, the Court turns to balance of harms.

Disclosure of an employer's trade secret and confidential information can constitute irreparable harm. *SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 715 (N.D. Ill. 2009). Such harm cannot generally be easily quantified, and therefore if disclosure is likely then the employer lacks an adequate remedy at law. *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*, 420 F.Supp.2d 866, 872 (N.D. Ill. 2006). In this case, Caremark has demonstrated that Saban had access to its confidential and trade secret information. However, it has not shown that Saban possesses, has disclosed, or is likely to disclose such information at SXC. The harm to Caremark if Saban is allowed to work at SXC is purely speculative and based solely on "what-ifs." This does not reach the threshold of a "clear

44

showing" of irreparable harm demanded for the entry of a preliminary injunction.

Caremark has, at best, established that disclosure of its confidential and/or trade secret information to SXC might put it at a competitive disadvantage. However, it has not shown that allowing Saban to work at SXC in the capacity of Executive Vice President of Mail Order and Specialty Operations will inevitably result in the disclosure of that information. The possibility that Saban could hypothetically go beyond the boundaries of his job duties and share information is not enough; there has been no showing that Saban disclosed confidential information, nor that he will. In the PBM industry, employers must rely on a certain degree of trust in professionals not to share confidential information as they move to different employers. Indeed, if it became known Saban shared Caremark's confidential information with SXC, both his and the company's reputations would likely suffer. In addition, the other safeguards discussed above decrease any likelihood that Saban will utilize confidential or trade secret information he may still retain by memory to Caremark's disadvantage.

On the other hand, the harm to Saban if an preliminary injunction is entered would be severe. Saban has worked in the PBM industry for 13 years, and enforcement of the non-competition clause of his Caremark Employment Agreement would bar him from doing any work in his field, in any location, for a year. Saban's ability to earn a living would be severely compromised if he is unable to work. While Caremark has raised the possibility that SXC might compensate Saban during that year, no evidence has been presented that SXC has any plans to do so. Moreover, entry of a preliminary injunction against Saban would trigger

45

a provision in his Caremark Employment Agreement requiring him to pay Caremark's litigation fees and costs.  Finally, while not the most critical factor in this case, the effect of an injunction on Saban would result in an unreasonable restraint on trade and competition, which harms the public interest.

Therefore, the balance of harms weighs heavily against entering a preliminary injunction in this case.

## IV. CONCLUSION

This litigation presents the issue of whether Plaintiff Joel Saban should be enjoined from pursuing his career in the PBM industry with SXC.  It is recommended that no injunction issue because the covenant not to compete is unenforceable as a product of bad faith and overreaching and because Defendants have failed to meet the standards for the extraordinary remedy of a preliminary injunction.  Defendants have failed to prove that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest.  Furthermore, an adequate remedy at law exists for Defendants' possible damage claims.

Date: June 21, 2010

Respectfully submitted,

_Morton Denlow_

_____

**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

Any objections to the Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of the receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the Magistrate Judge's Report and Recommendation.

**Copies sent to:**

Nicholas Anaclerio                  Howard M. Pearl
Brian V. Alcala                     Rex L. Sessions
Kamau A. Coar                       Peter J. Kocoras
Jill C. Taylor                      John M. Dickman
Lindsay Gowin                       Kevin M. Cloutier
Ungaretti & Harris LLP              Winston & Strawn LLP
3500 Three First National Plaza     35 West Wacker Drive
Chicago, IL 60602                   Chicago, IL 60601

Counsel for Plaintiff               Counsel for Defendants