## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Joel Saban, | ) | |
| | ) | |
|     Plaintiff/Counter-Defendant, | ) | |
| | ) | No. 10 C 02428 |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| Caremark Rx, L.L.C., a Delaware Limited | ) | |
| Liability Company, CVS Pharmacy, Inc., a | ) | |
| Rhode Island Corporation, and Caremark | ) | |
| L.L.C., a California Limited Liability Com- | ) | |
| pany, | ) | |
| | ) | |
|     Defendants/Counter-Plaintiffs. | ) | |

### MEMORANDUM OPINION AND ORDER

Caremark is a pharmacy business (Caremark is shorthand for related corporate entities), widely known as CVS Pharmacy on retail side of its business.[1] Caremark also provides a pharmacy benefits management service, and that part of the company employed Joel Saban as an executive who negotiated discounts with pharmaceutical manufacturers. R. 1 ¶¶ 1, 3, 12. As part of his relationship with Caremark, Saban signed an employment agreement in December 2009. *Id.* ¶ 1. Part of the agreement is a clause labeled "non-competition." R. 10-1, 15. The clause prevents Saban from "directly or indirectly" engaging in competition with Caremark, or any of its related

---

[1]The various Defendant entities are all related under the same umbrella. Caremark, L.L.C. has one member, Caremark Rx, L.L.C. R. 21 ¶ 6 ("R." refers to the docket entry number). Caremark Rx, L.L.C. has one member, CVS Pharmacy, Inc., a Rhode Island corporation with its principal place of business in Rhode Island. R. 21 ¶¶ 4, 5. Accordingly, all Defendants are Rhode Island citizens for diversity purposes. *Belleville Catering Co. v. Champaign Market Place, L.L.C.*, 350 F.3d 691, 392 (7th Cir. 2003). Because Plaintiff is an Illinois citizen, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. Additionally, the Court has jurisdiction under 28 U.S.C. § 1331 because Caremark raises a federal claim under 18 U.S.C. § 1030(g), and the Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

companies, for a one-year period after leaving employment with Caremark. *Id.* Saban resigned from his employment on April 20, 2010, R. 1 ¶ 12, and took on a position with SXC Health Solutions, Inc. R. 1 ¶ 13. Saban sued for a declaration invalidating the non-competition clause in his employment agreement. *Id.* ¶ 1. In response to Saban's declaratory judgment action, Caremark counterclaimed for breach of contract, violations of the Illinois Uniform Trade Secrets Act, 765 ILCS 1065/1 *et seq.*, breach of fiduciary duty, violations of the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030(g), and preliminary and permanent injunctive relief. R. 21, 17-55.

The previously-assigned judge referred Caremark's preliminary-injunction motion to Magistrate Judge Morton Denlow. Now pending before this Court are Caremark's objections to one set of the magistrate judge's evidentiary rulings and to the Report and Recommendation. R. 103. In a thorough 48-page opinion, the Report concluded that Caremark's preliminary-injunction motion should be denied. *Id.* at 47. For the following reasons, the Court overrules the objections, affirms the magistrate judge's evidentiary rulings, and adopts the Report [R. 103]. Accordingly, Caremark's motion for a preliminary injunction is denied.

## I.

"When a magistrate judge prepares a report and recommendation for a district court, the governing statute provides that the district court 'shall make a *de novo* determination' with respect to any contested matter." *Kanter v. C.I.R*, 590 F.3d 410, 416 (7th Cir. 2009) (citing 28 U.S.C. § 636(b)(1)(C)). If no specific objection is made, or

only a partial objection, the district court reviews the uncontested portions for clear error. *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999).

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. National Resources Defense Council*, 555 U.S. 7, 129 S. Ct. 365, 375-76 (2008). To prevail on a motion for a preliminary injunction, the moving party must show (1) a likelihood of success on the merits; (2) a lack of an adequate remedy at law; and (3) an irreparable harm will result if the injunction is not granted. *Lambert v. Buss*, 498 F.3d 446, 451 (7th Cir. 2007) (citations omitted). If the moving party meets these requirements, then the court balances the relative harms that could be caused to either party. *Id.*

A district court reviewing a magistrate's non-dispositive orders may overturn the order if it is "clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a). "A finding is clearly erroneous when, although there may be some evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Lange v. United States*, 31 F.3d 535, 539 (7th Cir. 1994) (citations and quotations omitted). Rulings on evidence are non-dispositive orders. *Phillips v. Raymond Corp.*, 213 F.R.D. 521, 525 (N.D. Ill. 2003) ("rulings on . . . evidence . . . are *not* dispositive rulings in any sense") (emphasis in original).

**II.**

An in-depth discussion of the facts can be found in the magistrate judge's Report. R. 103. Rather than reciting the facts at length here, only those facts relevant to the contested findings of fact and conclusions of law are repeated here.

SXC and Caremark provide pharmacy benefits management (PBM) services. R. 103, ¶¶ 2-4. PBMs manage prescription drug coverage for health plans, government agencies, and employees. *Id.* ¶ 5. As part of that management service, PBMs negotiate for discounts with drug manufacturers. *Id.* The primary factors that allow PBMs to negotiate discounts are the volume of business provided by a PBM and the PBM's promotion of a particular drug. *Id.* The terms of negotiated discount and rebate agreements are generally considered confidential. *Id.*

Caremark breaks its PBM business into three areas: sales, trade, and operation. R. 103 ¶ 6. Sales interacts with the groups serviced by the PBM; trade interacts with the pharmaceutical manufacturers to negotiate discounts and contracts pharmacies to join a particular plan/network; and operation is responsible for the actual dispensing of the pharmaceuticals at the pharmacies. *Id.* As a Caremark employee, Saban worked in the trade area and negotiated discounts and return policies with pharmaceutical manufacturers. *Id.* ¶ 6. Additionally, he oversaw the management of the Maximum Allowable Cost (MAC) pricing lists, a process by which Caremark sets prices on generic pharmaceuticals for clients. *Id.* ¶ 21. Saban had no responsibility for the operations group, which handled the mail order and specialty pharmacy business. *Id.* ¶ 21. Saban was on a number of Caremark business committees, and his service on

4

those committees included interaction with other parts of Caremark's PBM business. *Id.* ¶¶ 23-26.

Caremark's PBM services are much larger than SXC's services. R. 103 ¶ 8. Caremark services 2,000 health plans and offers health plan participants access to their pharmaceuticals at roughly 60,000 pharmacies. *Id.* ¶ 8. Caremark is one of the "Big 3" PBMs, and the Big 3 collectively have roughly 65% of the PBM market. *Id.* The remaining "Little 100," of which SXC is a member, service the remaining 35%. *Id.* Caremark's PBM revenue in 2009 was $50 billion, SXC's was $1 billion. *Id.* ¶ 9. Due to the size difference, the companies have to engage in negotiations with pharmaceutical manufacturers differently. Caremark is able to negotiate directly with manufacturers. *Id.* ¶ 10. In contrast, SXC has to aggregate with other PBMs via a third-party company to negotiate contracts. *Id.* ¶ 10. Caremark and SXC have been finalists for fewer than ten of the same clients over the past five years. *Id.* ¶ 11.

On December 14, 2009, Saban signed an employment agreement as part of his employment with Caremark. R. 103 ¶ 13. Part of the agreement was a non-competition clause providing that for "twelve months following the termination of employment, 'Executive will not, directly or indirectly, engage in competition with [Caremark].'" *Id.* ¶ 14. The non-competition clause defined "competition": "'Competition' shall mean engaging in *any activity* for a Competitor of the Company [in any capacity]." *Id.* (emphasis added). The clause also defined "competitor" as follows:

> "Competitor" shall mean any person, corporation, or other entity . . . doing business in any geographical area in which the Company or any of its subsidiaries or affiliates are doing or have imminent plans to do business, and which is

engaged in the operation of: (a) a retail business which includes or has imminent plans to include a pharmacy (i.e. the sale of prescription pharmaceuticals) as an offering or component of its business, . . . and/or (b) a business which includes or has imminent plans to include mail order prescription, specialty pharmacy and/or pharmacy benefits management . . . and/or (c) a business which includes or has imminent plans to include offering, marketing or the sale of basic acute health care services . . . [excluding businesses dedicated to the direct provision of health care, i.e. a hospital].

*Id.* ¶ 14.

Additionally, as part of the employment agreement, Saban agreed to a broad non-disclosure provision prohibiting him from using information obtained through his Caremark employment for any purpose other than his employment with Caremark. R. 103 ¶ 15. Further, the employment agreement contains a severability clause providing that "the unenforceability of any one clause shall in no way impair the enforceability of any of the other clauses herein." *Id.* ¶16.

Because both SXC and Caremark have various departments that could gain an improper advantage in their respective industries with confidential information from other departments, both SXC and Caremark have "firewalls" setup in their companies. R. 103 ¶¶ 40-43. A firewall is a company's system to compartmentalize departments or different branches of the business to maintain integrity and prevent disclosure of information between certain parts or departments of a company. *Id.* ¶ 40.

Saban resigned from Caremark on April 20, 2010. R. 103 ¶ 51. Saban does remember some of the pricing and rebate/discount information contained in the contracts he negotiated while working at Caremark. *Id.* ¶ 53. Now, at SXC, Saban is Executive Vice President for Pharmacy Operations. *Id.* ¶ 16. His job responsibilities

include overseeing the taking and filling of orders at pharmacies, lowering the time it takes to fill orders, and lowering the overhead costs of dispensing pharmaceuticals. *Id.* ¶ 27.

On April 20, 2010, Saban filed a declaratory judgment action seeking to invalidate the non-competition provision in his employment agreement. R. 103 ¶ 63. Caremark counterclaimed seeking injunctive relief and damages for breaches of contract and fiduciary duty, violation of Illinois' Trade Secrets Act, 76 ILCS 1065/1 *et seq.*, and violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g). *Id.* On May 12, 2010, Judge Pallmeyer entered a Temporary Restraining Order enjoining Saban from working at SXC for fourteen days; the time was extended until receipt of the magistrate judge's Report. *Id.* ¶ 64.

## III.

For the following reasons, Caremark's objections to the magistrate judge's rulings and Report are overruled. The magistrate judge's exclusion of computer forensic evidence was not clearly erroneous and the contested findings of fact and conclusions of law are adopted.

## A.

Caremark first objects to the magistrate judge's exclusion of certain computer forensic evidence in the form of a rebuttal witness, the proposed witness's affidavit, and two exhibits proffered after the hearing. Specifically, during the evidentiary hearing, the magistrate judge rejected computer forensic evidence proffered by Caremark regarding Saban's use of his work and personal computers and data devices

that were attached to the computers. While working for Caremark, Saban used personal data devices (USB drives) and email to move files between his Caremark computer and his personal computer. R. 103 ¶¶ 37-38. But Saban claimed to have no Caremark information or documents. Caremark attempted to offer as a rebuttal witness Lee Neubecker, its computer forensic vendor, as well as two exhibits created from Neubecker's research and an affidavit from Neubecker in opposition to Saban's motion to exclude the aforementioned exhibits. R. 112 at 5-7.

The magistrate judge excluded the evidence. The magistrate judge excluded the two exhibits and the affidavit because "there was no real foundation, there was no real opportunity to cross-examine, there was no discovery allowed, and I don't believe that any of this information adds anything to the hearing with respect to the likelihood of Mr. Saban having access to or the ability to use any additional information to Caremark's disadvantage." R. 116 at 12. Additionally, instead of permitting Neubecker to testify as a rebuttal witness, the magistrate judge relied on an offer of proof from Caremark in lieu of Neubecker's testimony. R. 112 at 6. Furthermore, the magistrate judge found that Neubecker's testimony and the challenged exhibits would have been unnecessarily cumulative in light of the offer of proof.

The concerns identified by the magistrate judge – the cumulative nature of the evidence and its undue prejudice – are the concerns underlying Federal Rule of Evidence 403. Rule 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . or by considerations of undue delay . . . or needless presentation of cumulative evidence." The judge who

sees and hears the evidence first-hand is the best person to engage in the balancing required by Rule 403. *United States v. Davis*, 772 F.2d 1339, 1344 (7th Cir. 1985). For this reason, when reviewing Rule 403 determinations from the district court, the Seventh Circuit considers itself "'obligated to afford substantial deference.'" *Id.* (quoting *United States v. Watson*, 623 F.2d 1198, 1203 (7th Cir. 1980)).

The magistrate judge made a sound determination in ruling that the computer forensic evidence would be so unfairly prejudicial and cumulative as to substantially outweigh the evidence's probative value. Regarding Neubecker as a rebuttal witness, the offer of proof furnished by Caremark addressed Saban's use of personal data devices to store Caremark information. The magistrate judge's decision to exclude Neubecker's rebuttal testimony, which would have covered ground already in the offer of proof, prevented needless cumulative evidence. Regarding the exhibits, the magistrate judge also determined that they were cumulative and that the judge would continue to rely upon the offer of proof, which addressed the same issue as the exhibits. As for the affidavit that was used in opposition to Saban's motion to exclude, the magistrate judge determined that allowing it would be prejudicial because Saban did not have an opportunity to cross-examine Neubecker. Caremark argues that Saban would have had an opportunity to cross-examine Neubecker if the magistrate judge had allowed his testimony as a rebuttal witness. But Caremark cannot shift the blame to the magistrate judge's proper Rule 403 ruling regarding Neubecker as a rebuttal witness. If Caremark wanted to make full use of Neubecker, then it should have identified him as a witness for the hearing. Unfortunately, Caremark did not. R. 116

9

at 4. In fact, Neubecker was not presented until the final day of the hearing – at the close of evidence – as a surprise witness. *Id.* Saban had no warning that Neubecker would be a witness, and after the magistrate judge determined (properly) that Neubecker's testimony would be unnecessary and an unfair surprise, Saban was left with no opportunity to cross-examine Neubecker. Thus, the magistrate judge did not commit clear error in excluding the evidence, and the objections to the contrary are overruled.

**B.**

After careful review of the record and the findings of fact to which Defendant did not object, the Court adopts the magistrate judge's uncontested findings of fact. Additionally, after a *de novo* review of the findings of fact to which Defendant did object, the Court adopts the remaining findings of fact for the following reasons.

**1.    SXC Rarely Competes With Caremark**.

After an extensive analysis of Caremark and SXC's business operations, the magistrate judge determined that "Caremark and SXC Rarely Compete." R. 103, ¶¶ 8-12. Caremark objects to this finding, citing an online news article in which, when asked about competition in the PBM business from Caremark, SXC's CEO said "We'll kick their ass." R. 111 at 12-13. Additionally, Caremark noted that SXC classified Caremark as a competitor in a presentation to investors. *Id.* at 13. But Caremark's objections incorrectly describe the evidence and the magistrate judge's finding.

To be precise in describing the magistrate judge's finding, the judge determined that Caremark and SXC *rarely* compete. R. 103 at 7. Nothing presented by Caremark

suggests that that finding is wrong.  To the contrary, the evidence presented shows that competition between Caremark and SXC is in fact rare.  In terms of total revenue, SXC is 2% the size of Caremark.  Although the disparity in revenue does not by itself answer the competition question, it does inform the analysis. SXC's relatively small size means that it is incapable of bringing pharmaceutical manufacturers to the bargaining table.  Instead, it must band together with several other small PBM services via a third-party aggregator.  SXC's President recognized the size disparity and the effect on competition: "As a general rule, if it's a large account and it's a large mail order operation, we no-bid."  R. 103 ¶ 11.  SXC's size keeps it in a different PBM realm than Caremark.  Admittedly, the two realms do rub against one another – but only *rarely* – and that is why, over the last five years, Caremark and SXC have competed as finalists for the same client fewer than ten times.  Given Caremark's service to over 2,000 clients, *id.* ¶ 8, those ten clients would constitute half of one percent of Caremark's clients.  And even for SXC, with its much fewer 500 clients, those ten clients would constitute only 2% of it clients.  *Id.* ¶ 9.

Caremark's arguments do not overcome this objective evidence.  The "kick their ass" statement made by SXC's CEO is nothing more than puffery, evidenced by the crude language used.  Additionally, Caremark's argument that it has been labeled as "competition" in an SXC presentation to investors overstates the evidence.  Admittedly, in the presentation to investors, Hearing D. Exh. 43, one slide displays the Caremark logo at the bottom of the slide under the word "competition."  But Caremark's logo is not alone; it is one of eight logos, including the other two members of the "Big 3."  In

11

an industry in which 65% of the market share is controlled by a group known in the trade as the "Big 3," it is not surprising that any PBM would acknowledge the major players in the industry. Merely acknowledging Caremark as the "competition" – along with several other companies – on one slide of one slide-show does not suggest that SXC and Caremark actually compete in a meaningful way.

## 2. Information Available to and Used By Saban with Caremark.

Caremark objects to the Report's findings of fact regarding the extent of the information that Saban had available to him while at Caremark. R. 111 at 13-14. Caremark contends that the Report "acknowledges only three categories of information to which Saban had access at Caremark." *Id.* at 13. Caremark further argues that the magistrate judge's Report "overlooks Saban's access to additional information regarding Caremark's PBM operations, including volumes, margins, operating costs, profitability, and sales." *Id.* This argument inaccurately describes the findings.

The magistrate judge understood and acknowledged that Saban had access to a variety of confidential information during his Caremark employment by virtue of his job responsibilities and various committees on which he served. R. 103 ¶¶ 23-25, 33. For example, the magistrate judge noted that Saban was a member of the Executive Underwriting Committee, where he engaged in discussions relating to a client's volume and pricing offered by Caremark for mail and retail pharmacies. *Id.* ¶ 25. Caremark's arguments that the Report "overlooked" testimony is undermined by the Report.

Caremark does not argue that Saban has kept any of the information to which he had access. The objections to the Report do not rely on Caremark's offer of proof to

suggest that Saban may have copied the information to his personal computer. Thus, the Court adopts the Report's finding that the only information that Saban has in his possession is the information that he has in his head. R. 103 ¶ 35.

Caremark further objects to the Report's finding that the information available to Saban while at Caremark becomes stale quickly. R. 111 at 13-14. The Report found that the information to which Saban had access is revised so regularly that the information becomes stale. R. 103 ¶ 34. Caremark argues that although the particular rates and figures may change, "the methods by which arrangements are contracted do not change quickly. Saban understood the strategies used to negotiate rebate rates and the methodology for calculating MAC prices." R. 112 at 13-14. Thus, Caremark concedes that the specific information Saban had access to becomes stale as rates "evolve," and instead focuses on Saban's understanding of negotiation strategies. Saban's skills as a negotiator, while developed at Caremark, are not confidential information to which Caremark can claim ownership. In light of Caremark's concession that "evolving" rates and discounts render that information useless for SXC's benefit, the Report's finding that Saban did not have access to any fruitful, confidential information is correct and adopted. To the extent that Saban still has access to any information, it is only in his head, and the substance of any rates or discounts Saban could remember would be stale at this point.

### 3. Saban's Roles at Caremark and SXC will not Overlap.

The Report laid out Saban's responsibilities at both Caremark and SXC. R. 103 ¶¶ 19-30. The Report found that the responsibilities do not overlap. Caremark argues

that the responsibilities will overlap, particularly because Saban was and is a top-level executive. R. 111 at 11. Caremark relies on a few e-mail conversations between Saban and SXC to argue that Saban will be involved in more than just operations work at SXC. *Id.* But the Report correctly relied on the actual testimony describing the responsibilities of both job positions, which were well-established, and the Report's findings on this issue is adopted.

## C.

Applying the factual findings to the conclusions of law, the Report ultimately recommended that Caremark's motion for preliminary injunction should be denied because Caremark is unlikely to succeed on the merits, among other reasons. R. 103 at 27. Caremark has objected to nearly all of the Report's conclusions of law (the parties do agree that Rhode Island law governs the dispute). After reviewing the conclusions *de novo*, the Court agrees with the Report's conclusions of law and denies the motion for a preliminary injunction.

### 1. Caremark Has Failed to Show a Likelihood of Success on the Merits as to the Validity of the Non-Competition Covenant.

The Report concluded that Caremark did not prove it was likely to succeed on the merits with any of its counterclaims. Caremark only objects to the Report's conclusion regarding the breach of contract claims.[2] The Report concluded that there was not a likelihood of success on the merits regarding the non-competition covenant

---

[2]Caremark states that it "does not waive" the other claims, R. 112, 3 n. 2, which is true enough, but because Caremark did not object to the Report's conclusions regarding likelihood of success on the merits for those claims, and the conclusions are not clearly erroneous, the Court adopts those conclusions for purposes of this stage of the litigation.

because the covenant is unreasonable and unenforceable. R. 103 at 28. The Report concluded that Rhode Island will enforce a non-compete "as written only if the contract is reasonable and does not extend beyond what is apparently necessary for the protection of those in whose favor it runs." *Durapin, Inc. v. American Products,* 559 A.2d 1051, 1053 (R.I. 1989). Thus, a party seeking to enforce a restrictive covenant must show that: (1) the provision is ancillary to an otherwise valid transaction or relationship; (2) adequate consideration supports the provision; and (3) the provision protects a legitimate interest. *Id.* If the restraint is "somewhat greater than required to protect the legitimate interests of the promisee," the court may partially enforce the restraint to the extent necessary to protect the promisee's legitimate interest so long as the modification does not impose undue hardship on the promisor or adversely affect the public interest. *Id.* at 1058-59. However, the Court will not partially enforce a restraint if the circumstances indicate bad faith or deliberate overreaching on the part of the promisee. *Id.* at 1058.

The Report concluded that the surface requirements of a non-competition covenant had all been met; that conclusion is not clearly erroneous and is adopted. But the Report also concluded that the non-competition covenant was unreasonable given the limit of the legitimate interests of Caremark. Moreover, the Report concluded that the non-competition covenant was the product of deliberate overreaching and was created in bad faith. Thus, the entire non-compete was unenforceable.

Caremark objects, arguing that the non-compete is reasonable under Rhode Island law, and that, even if the non-compete as written is unreasonable, the Report

15

should have tailored the non-compete to be reasonable. R. 111 at 4. Caremark argues that the Report's conclusion misinterprets Rhode Island law by requiring a non-compete to specifically lay out the specific list of positions or job duties that an employee is prohibited from accepting. *Id.* Additionally, Caremark cites *Aim High Academy*, 2008 WL 5325586 (R.I. Super. Ct. 2008), arguing that Rhode Island courts have found a very similar non-compete to be valid. R. 111 at 5.

a. **Reasonableness.**

A restrictive covenant is reasonable only if it does not "extend beyond what is apparently necessary for the protection of those in whose favor it runs." *Durapin v. American Products,* 559 A.2d 1051, 1053 (R.I. 1989). The Rhode Island Supreme Court has adopted the Restatement (Second) of Contracts to govern this inquiry. *Cranston Print Works v. Pothier*, 848 A.2d 213, 219 (R.I. 2004). Section 188 of the Restatement instructs: "[a] promise to refrain from competition that imposes a restraint . . . is unreasonably in restraint of trade if (a) the restraint is greater than is needed to protect the promisee's legitimate interest, or (b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public." Restatement (Second) of Contracts § 188(1)(a), (b) (1981). A post-employment restraint may impose a hardship on the employee if it "inhibits his personal freedom by preventing him from earning his livelihood if he quits." *Id.* at § 188, cmt. c. In Rhode Island, courts conducting a reasonableness inquiry look to: (1) whether the provision is narrowly tailored to protect legitimate interests; (2) whether it is reasonably limited in activity, geographic area, and time; (3) whether the promisee's interests are not outweighed by

hardship to the promisor; and (4) whether the restriction is likely to injure the public. *R.J. Carbone Co. v. Regan*, 582 F. Supp. 2d 220, 225-26 (D.R.I 2008).

The language of Saban's non-compete is unreasonable because of its canyon-like broad coverage, which has its genesis in the expansive definition of "Competitor" and "Competition." As noted above, "competition" in the non-compete means "engaging in *any activity* for a Competitor of the Company [in any capacity]." R. 103 at ¶ 14 (emphasis added). And "competitor" means more than just other PBMs; it includes any company that operates, as a component of its business, a pharmacy. *Id.*

If the plain terms of the non-compete were enforced, Saban would be precluded from working in a wide variety of jobs which have zero relation to his work at Caremark. For example, the magistrate judge noted in the Report that Saban could not work as a grocery store manager if the grocery store had a pharmacy. R. 103 at 13. And that is not all. The non-compete would go well beyond working in management positions. For example, under the terms of the non-compete, Saban could not serve as a 'greeter' at a Wal-Mart that had a pharmacy. That scope of restriction extends well beyond what is necessary for Caremark to protect its legitimate interests.

Caremark contends that these hypotheticals are improper, and that the Court should take only into account the "particular circumstances of the case." R. 111 at 6. Citing *Dial Media, Inc. v. Schiff*, 612 F. Supp. 1483, 1488 (D.R.I. 1985), Caremark argues that the words of a non-compete should be interpreted in light of the intent of the parties. But *Dial Media* analyzed whether or not a former employee's conduct was covered by a specific term of the non-compete, and the court there construed a certain

term in the non-compete to determine whether the conduct fell within the terms of the non-compete. *Id.* *Dial Media* does *not* stand for the proposition that a court determining the reasonableness and scope of a non-compete is required to consider the intent of the parties to the exclusion of the non-compete's written terms. Indeed, *Dial Media* did conduct its own analysis of whether the non-compete was reasonable, and when doing so, the court did not limit the reasonableness inquiry to what the parties subjectively intended or envisioned. *Id.* at 1488-1491. Ultimately, Caremark has no response to the magistrate judge's interpretation of the non-compete's written terms.

Nonetheless, citing *Aim High*, Caremark maintains that the non-compete is reasonable because "noncompete agreements with equally broad activity restrictions," have been enforced in Rhode Island. R. 111 at 5. It should be noted at the outset, however, that the non-compete in *Aim High* was found to be unreasonable, and was accordingly tailored in terms of geography. The non-compete there provided that:

> Employee will not compete, either directly or indirectly, with [the gymnastics gym] whether as an individual, officer, director, agent, employee or stockholder or in any other capacity in any business, enterprise or organization serving any location in Rhode Island.

*Aim High*, 2008 WL 5325586, at *5 (quotation marks omitted). But there ends the similarity between *Aim High's* non-compete and the present non-compete. *Aim High* did not include an expansive definition of "competition" or "compete" that would have prevented the employee from working – in *any* capacity – at a business with imminent plans to open a gymnastics gym or a fitness center that had a gymnastics gym as a minor aspect of its business. Additionally, as noted, and displaying Rhode Island's

high level of scrutiny against non-competes, the court in *Aim High* still tailored down the non-compete from a statewide ban on competition to a fifteen-mile radius. *Id.* at *8.

### b. **Partial Enforcement**.

The conclusion that the non-compete is unreasonable does not end the Court's analysis. Rhode Island courts permit tailoring of unreasonable non-compete provisions absent a showing of bad faith or deliberate overreaching. *Durapin*, 559 A.2d at 1058. But Caremark has waived any argument for partial enforcement or tailoring, and even if the argument was not waived, Caremark deliberately overreached in constructing Saban's non-compete, and so the non-compete is unenforcable.

When explicitly asked by the magistrate judge whether partial enforcement was an option, Caremark rejected that opportunity. The following exchange during the hearing revealed Caremark's position regarding tailoring:

Court: Rhode Island . . . encourages . . . partial enforcement . . . .

Caremark: [P]erhaps if we were talking about a gymnastics teacher . . . some sort of tailoring might be appropriate. With all due respect, your Honor, we're not talking about some low-level paper salesman.

Court: So, you view it as an all or nothing proposition?

Caremark: We view this contract as fully enforceable [per the terms of the agreement].

Court: You don't want me to even try tailoring? You'll take it all or nothing?

Caremark: Well, we do not believe it should be tailored . . . . We believe that it should be fully enforceable as to the entire activity restraint.

R. 117 at 8.

In its proposed findings, Caremark did suggest, in the space of one paragraph, that tailoring would be appropriate in the event the court determined that the non-compete was overly broad. R. 120, Exh. A at 42. But Caremark provided no explanation why, if the non-compete were to be found unenforceable as written, the court should then specifically tailor the non-compete to the SXC position. When posed with the prospect of tailoring at the hearing, Caremark chose not to explain how to arrive at the proposal, and indeed disclaimed that the court should do so. Caremark accurately notes that waiver is the voluntary, intentional relinquishment of a known right. *Id.* at 10. That is what Caremark did. When faced straight-on with the prospect of tailoring, Caremark argued against tailoring, and then refused to make even a conditional argument (the condition being what happens if the non-compete is unreasonable). The condition occurred, and Caremark is left with its waiver.

Even if Caremark had not waived its right to partial enforcement, tailoring would be inappropriate given the deliberate overreaching by Caremark in drafting the provision. *Durapin*, 559 A.2d at 1058. To be sure, of course a finding of unreasonable-ness does not by itself create an inference of deliberate overreaching. But here, as explained above, the non-compete extends so far beyond Caremark's legitimate interests that the non-compete is not close to being narrowly tailored. The non-compete made no effort to tailor to Saban's particular expertise and experience in Caremark's "Trade" area of PBM services. To the contrary, the non-compete used extraordinarily broad definitions of "Competitor" and "Competition" to push the

coverage of the non-compete as far as possible. This amounts to a deliberate act of overreaching. Since at least 1938, Rhode Island courts have required narrow tailoring in non-compete provisions. *See Koppers Products Co. v. Readio*, 197 A. 411, 444-445 (R.I. 1938). To draft such a broad non-compete in a jurisdiction with well-established case law requiring narrow tailoring is to deliberately overreach.

Moreover, the breadth of the non-compete is even further excessive when viewed in light of a confidential-information non-disclosure provision in the employment agreement. The non-disclosure provision helps protect Caremark's legitimate interests, and yet Caremark still drafted a much-too-expansive non-compete.

## 2. Non-Disclosure Agreement.

The Report also determined that Caremark was unlikely to succeed on the merits of its breach of contract claim based upon the non-disclosure agreement. R. 103 at 33-34. Caremark argues that there is a sufficient risk of non-disclosure to justify a preliminary injunction. R. 111, 15-16. Caremark's concerns are not supported by the evidence. First, the uncontested finding of fact indicated that Saban had not retained any confidential information, except for what he remembered. Additionally, Caremark concedes that the information Saban may still remember, like discount rates, turn stale as they "evolve."

Moreover, Saban's roles at SXC are different from his roles at Caremark. Saban has moved on to a new aspect of PBM services that would not use what stale information he retains. Caremark has merely alleged what Saban could do with the information he has. But a movant for a preliminary injunction must prove more than

a speculative harm. *East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7thCir. 2005) (Under traditional equitable principles, in order to issue a preliminary injunction, "speculative injuries do not justify this extraordinary remedy."). Caremark argues that disclosure is not speculative, and is instead inevitable. R. 111 at 16. But Caremark's position suffers from an inherent tension: on the one hand, Saban is a top executive with an incredible memory who has retained an immense amount of sensitive information. On the other hand, Saban will slip up and inevitably use protected confidential information, requiring the issuance of a preliminary injunction. In light of the differences in job duties, and the nature of the limited confidential information still retained in Saban's memories, the Court adopts the Report's finding that there Caremark has not demonstrated likelihood of success on the merits of the non-disclosure agreement.

### 3. Remaining Preliminary Injunction Factors.

Caremark has failed to establish a likelihood of success on the merits of the breach of contract claims. As the Report did, the Court briefly addresses the remaining considerations for a preliminary injunction, and adopts those conclusions of law from the Report. First, the Report determined that Caremark was not likely to suffer irreparable harm because there was no showing that any confidential information had been disclosed or used by Saban at SXC. R. 103 at 44-45. Caremark reiterates that Saban will inevitably disclose or use some confidential information in his employment with SXC, and this will cause irreparable harm. R. 111 at 16. But given the staleness of any information remembered by Saban, Caremark has not established how Saban's

employment with SXC would lead to irreparable harm. Additionally, given the finding that SXC and Caremark rarely compete, it is unclear what harm Caremark would even suffer in the event of an accidental or inevitable disclosure.

Regarding adequacy of legal remedies, Caremark argues that the Report is silent on this issue. R. 111 at 18. But the Report does address the issue of adequacy in tandem with a discussion of irreparable harm. R. 103 at 44. The Report notes that disclosure of trade secret information can constitute an irreparable harm because the damage is not easily quantified, and if disclosure is likely, then the employer lacks an adequate remedy. *Id.* (citing *Diamond Blade Warehouse v. Paramount Diamond Tools*, 420 F. Supp.2d 866, 872 (N.D. Ill. 2006)). Because the Report and this Court have determined that there is no real risk of disclosure, Caremark does not lack an adequate remedy.

Lastly, the Report determined that the balance of harms weighs in Saban's favor. R. 103 at 45-46. Caremark argues that any inability to earn an income in the PBM field is a result of Saban's breach, and so he brought on the harm. R. 111 at 19-20. But Caremark has failed to show what irreparable harm would be incurred if Saban went to work at SXC. To reiterate, Caremark has not shown any particular risk of disclosure or irreparable harm it would face if Saban works at SXC during this litigation's pendency. In contrast, Saban would be prevented from earning income for an entire year. The lost wages for Saban are a certainty if the preliminary injunction is granted; Caremark's damages are speculative and unproven at this stage of the litigation. The balance of harms weighs in Saban's favor.

## III.

The Court overrules the objections to the magistrate judge's evidentiary rulings

and to the Report, and adopts the Report and Recommendation in full.


ENTERED:

_____
Honorable Edmond E. Chang
United States District Judge

Date: April 11, 2011